# TIBBS v. FLORIDA

No. 81–5114.   Argued March 2, 1982—Decided June 7, 1982

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 47.

*Louis R. Beller,* by appointment of the Court, 454 U. S. 1078, argued the cause and filed a brief for petitioner.

*Deborah A. Osmond,* Assistant Attorney General of Florida, argued the cause *pro hac vice* for respondent. With her

on the briefs were *Jim Smith*, Attorney General, and *Michael A. Palecki*, Assistant Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

We granted certiorari to decide whether the Double Jeopardy Clause[1] bars retrial after a state appellate court sets aside a conviction on the ground that the verdict was against "the weight of the evidence." After examining the policies supporting the Double Jeopardy Clause, we hold that a reversal based on the weight, rather than the sufficiency, of the evidence permits the State to initiate a new prosecution.

I

In 1974, Florida indicted petitioner Delbert Tibbs for the first-degree murder of Terry Milroy, the felony murder of Milroy, and the rape of Cynthia Nadeau. Nadeau, the State's chief trial witness, testified that she and Milroy were hitchhiking from St. Petersburg to Marathon, Fla., on February 3, 1974. A man in a green truck picked them up near Fort Myers and, after driving a short way, turned off the highway into a field. He asked Milroy to help him siphon gas from some farm machinery, and Milroy agreed. When Nadeau stepped out of the truck a few minutes later, she discovered the driver holding a gun on Milroy. The driver told Milroy that he wished to have sex with Nadeau, and ordered her to strip. After forcing Nadeau to engage in sodomy, the driver agreed that Milroy could leave. As Milroy started to walk away, however, the assailant shot him in the shoulder. When Milroy fell to the ground, pleading for his life, the gunman walked over and taunted, "Does it hurt, boy? You in

---

*Solicitor General Lee, Assistant Attorney General Jensen, Samuel J. Alito, Jr., and John Fichter De Pue filed a brief for the United States as amicus curiae urging affirmance.

[1] "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . ." U. S. Const., Amdt. 5. The Clause applies to the States through the Due Process Clause of the Fourteenth Amendment. *Benton* v. *Maryland*, 395 U. S. 784 (1969).

pain? Does it hurt, boy?" Tr. 508. Then, with a shot to the head, he killed Milroy.

This deed finished, the killer raped Nadeau. Fearing for her life, she suggested that they should leave together and that she "would be his old lady." *Id.*, at 510. The killer seemed to agree and they returned to the highway in the truck. After driving a short distance, he stopped the truck and ordered Nadeau to walk directly in front of it. As soon as her feet hit the ground, however, she ran in the opposite direction. The killer fled with the truck, frightened perhaps by an approaching car. When Nadeau reached a nearby house, the occupants let her in and called the police.

That night, Nadeau gave the police a detailed description of the assailant and his truck. Several days later a patrolman stopped Tibbs, who was hitchhiking near Ocala, Fla., because his appearance matched Nadeau's description. The Ocala Police Department photographed Tibbs and relayed the pictures to the Fort Myers police. When Nadeau examined these photos, she identified Tibbs as the assailant.[2] Nadeau subsequently picked Tibbs out of a lineup and positively identified him at trial as the man who murdered Milroy and raped her.[3]

---

[2] The State's witnesses conceded that, at the time of this identification, Nadeau saw only photographs of Tibbs; she did not have the opportunity to pick his picture out of a photographic array. An officer explained, however, that Nadeau had viewed photographs of single suspects on three or four other occasions and had not identified the killer on any of those occasions. Nadeau also had examined several books of photographs without making an identification. We do not pass upon any possible due process questions raised by the State's identification procedures, see generally *Neil* v. *Biggers*, 409 U. S. 188 (1972); *Simmons* v. *United States*, 390 U. S. 377 (1968), because Tibbs' challenge to retrial rests solely upon double jeopardy grounds.

[3] The State's remaining witnesses included law enforcement agents, a man who had driven Milroy and Nadeau to Fort Myers, the houseowner who had called the police for Nadeau, acquaintances of Milroy, a doctor who had examined Nadeau shortly after the crimes, and the doctor who had performed the autopsy on Milroy. The doctors confirmed that Nadeau had had intercourse on the evening of February 3 and that Milroy

Tibbs' attorney attempted to show that Nadeau was an un-reliable witness. She admitted during cross-examination that she had tried "just about all" types of drugs and that she had smoked marihuana shortly before the crimes occurred. *Id.*, at 526, 545–546. She also evidenced some confusion about the time of day that the assailant had offered her and Milroy a ride. Finally, counsel suggested through questions and closing argument that Nadeau's former boyfriend had killed Milroy and that Nadeau was lying to protect her boy-friend. Nadeau flatly denied these suggestions.[4]

In addition to these attempts to discredit Nadeau, Tibbs testified in his own defense. He explained that he was college educated, that he had published a story and a few poems, and that he was hitchhiking through Florida to learn more about how people live. He claimed that he was in Day-tona Beach, across the State from Fort Myers, from the eve-ning of February 1, 1974, through the morning of February 6. He also testified that he did not own a green truck, and

---

had died that evening from a bullet wound in the head. The other wit-nesses confirmed that Nadeau and Milroy had been hitchhiking through Fort Myers on February 3 and that Nadeau had arrived at a house, in a hysterical condition, that evening.

A Florida prisoner, sentenced to life imprisonment for rape, also testi-fied for the State. This prisoner claimed that he had met Tibbs while Tibbs was in jail awaiting trial and that Tibbs had confessed the crime to him. The defense substantially discredited this witness on cross-examina-tion, revealing inconsistencies in his testimony and suggesting that he had testified in the hope of obtaining leniency from the State.

[4] The results of two polygraph examinations, described in a report read to the jury, indicated that Nadeau was "truthful as to the fact that a black male driving a green pickup truck had picked them up and that this black male had murdered Terry Milroy," Tr. 302. The polygraphs also sug-gested that Nadeau was truthful when she identified Tibbs as the assailant. *Id.*, at 303. Tibbs challenged the admissibility of these polygraphs during his first appeal. See *Tibbs v. State*, 337 So. 2d 788, 796 (Fla. 1976) (Rob-erts, J., dissenting). The justices who voted to reverse Tibbs' conviction, however, did not reach the issue and we express no opinion on this matter of state law.

that he had not driven any vehicle while in Florida. Finally, he denied committing any of the crimes charged against him.

Two Salvation Army officers partially corroborated Tibbs' story. These officers produced a card signed by Tibbs, indicating that he had slept at the Daytona Beach Salvation Army Transit Lodge on the evening of February 1, 1974. Neither witness, however, had seen Tibbs after the morning of February 2. Tibbs' other witnesses testified to his good reputation as a law-abiding citizen and to his good reputation for veracity.

On rebuttal, the State produced a card, similar to the one introduced by Tibbs, showing that Tibbs had spent the night of February 4 at the Orlando Salvation Army Transit Lodge. This evidence contradicted Tibbs' claim that he had remained in Daytona Beach until February 6, as well as his sworn statements that he had been in Orlando only once, during the early part of January 1974, and that he had not stayed in any Salvation Army lodge after February 1. After the State presented this rebuttal evidence, Tibbs took the stand to deny both that he had been in Orlando on February 4 and that the signature on the Orlando Salvation Army card was his.

The jury convicted Tibbs of first-degree murder and rape. Pursuant to the jury's recommendation, the judge sentenced Tibbs to death. On appeal, the Florida Supreme Court reversed. *Tibbs* v. *State*, 337 So. 2d 788 (1976) *(Tibbs I)*. A plurality of three justices, while acknowledging that "the resolution of factual issues in a criminal trial is peculiarly within the province of a jury," *id.*, at 791, identified six weaknesses in the State's case.[5] First, except for Nadeau's testimony, the State introduced no evidence placing Tibbs in or near Fort Myers on the day of the crimes. Second, although

---

[5] The plurality completely discounted the testimony of the convicted rapist who recounted Tibbs' alleged confession. See n. 3, *supra*. This testimony, the justices concluded, appeared "to be the product of purely selfish considerations." 337 So. 2d, at 790.

Nadeau gave a detailed description of the assailant's truck,
police never found the vehicle. Third, police discovered nei-
ther a gun nor car keys in Tibbs' possession. Fourth, Tibbs
cooperated fully with the police when he was stopped and
arrested. Fifth, the State introduced no evidence casting
doubt on Tibbs' veracity.[6] Tibbs, on the other hand, pro-
duced witnesses who attested to his good reputation. Fi-
nally, several factors undermined Nadeau's believability.
Although she asserted at trial that the crimes occurred dur-
ing daylight, other evidence suggested that the events oc-
curred after nightfall when reliable identification would have
been more difficult. Nadeau, furthermore, had smoked mar-
ihuana shortly before the crimes and had identified Tibbs
during a suggestive photograph session.[7] These weaknesses
left the plurality in "considerable doubt that Delbert Tibbs
[was] the man who committed the crimes for which he ha[d]
been convicted." *Id.*, at 790. Therefore, the plurality con-
cluded that the "interests of justice" required a new trial.
*Ibid.*[8]

Justice Boyd concurred specially, noting that "'[t]he test
to be applied in determining the adequacy of a verdict is
whether a jury of reasonable men could have returned that
verdict.'" *Id.*, at 792 (quoting *Griffis* v. *Hill*, 230 So. 2d 143,

---

[6] The plurality opinion summarily dismissed the effect of the rebuttal evi-
dence showing that Tibbs was in Orlando on February 4. A "superficial
comparison" of the signature on the Orlando transit card with Tibbs' own
signature, the plurality found, supported Tibbs' claim that he had not
signed the card. Moreover, evidence that Tibbs was in Orlando on Febru-
ary 4 still did not place him in Fort Myers on February 3. *Id.*, at 790, n. 1.

[7] See n. 2, *supra.*

[8] At the time of Tibbs' first appeal, Florida Appellate Rule 6.16(b) (1962)
provided in part:

"Upon an appeal from the judgment by a defendant who has been sen-
tenced to death the appellate court shall review the evidence to determine
if the interests of justice require a new trial, whether the insufficiency of
the evidence is a ground of appeal or not."

The substance of this Rule has been recodified as Florida Appellate Rule
9.140(f).

145 (Fla. 1969)). Apparently applying that standard, Justice Boyd found the State's evidence deficient. He concluded that "the weakness of the evidence presented in the trial court might well require that [Tibbs] be released from incarceration without further litigation," but "reluctantly concur[red]" in the plurality's decision to order a new trial because he understood Florida law to permit retrial. 337 So. 2d, at 792.[9]

On remand, the trial court dismissed the indictment, concluding that retrial would violate the double jeopardy principles articulated in *Burks* v. *United States*, 437 U. S. 1 (1978), and *Greene* v. *Massey*, 437 U. S. 19 (1978).[10] An intermediate appellate court disagreed and remanded the case for trial. 370 So. 2d 386 (Fla. App. 1979). The Florida Supreme Court affirmed the latter decision, carefully elaborating the difference between a reversal stemming from insufficient evidence and one prompted by the weight of the evidence. 397 So. 2d 1120 (1981) *(per curiam) (Tibbs II)*. As the court explained, a conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reversal based on the weight of the evidence, on the other hand, draws the appellate court into questions of credibility. The "weight of the evidence" refers to "a determination [by] the trier of fact that

---

[9] At two points, Justice Boyd stated that he "concur[red] in the majority opinion." 337 So. 2d, at 792. However, because we are uncertain what weight Florida attaches to special concurrences of this sort and because Justice Boyd's views differed from those of the other justices voting to reverse, we have chosen to designate the lead opinion a "plurality" opinion.

Three justices dissented from the court's disposition of Tibbs' appeal. They declared that "the evidence in the record before us does not reveal that the ends of justice require that a new trial be awarded," *id.*, at 796–797, and rejected Tibbs' other assignments of error.

[10] We decided *Burks* and *Greene* after the Florida Supreme Court reversed Tibbs' conviction, but before he could be retried. We have applied *Burks* to prosecutions that were not yet final on the date of that decision. See *Hudson* v. *Louisiana*, 450 U. S. 40 (1981).

a greater amount of credible evidence supports one side of an issue or cause than the other." *Id.*, at 1123.[11]

The Florida Supreme Court then classified *Tibbs I* as a reversal resting on the weight of the evidence. Nadeau's testimony, if believed by the jury, was itself "legally sufficient to support Tibbs' conviction under Florida law." 397 So. 2d, at 1126. In deciding to upset Tibbs' conviction, the court in *Tibbs I* had stressed those "aspects of Nadeau's testimony which cast serious doubt on her believability," 397 So. 2d, at 1126, an approach that bespoke a reweighing of the evidence. "Only by stretching the point . . . ," the court concluded in *Tibbs II*, "could we possibly use an 'insufficiency' analysis to characterize our previous reversal of Tibbs' convictions." *Ibid.*[12]

---

[11] Other courts similarly have explained the difference between evidentiary weight and evidentiary sufficiency. In *United States* v. *Lincoln*, 630 F. 2d 1313 (CA8 1980), for example, the court declared:

"The court reviewing the sufficiency of the evidence, whether it be the trial or appellate court, must apply familiar principles. It is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn in its favor from the evidence. The verdict may be based in whole or in part on circumstantial evidence. The evidence need not exclude every reasonable hypothesis except that of guilt . . . ." *Id.*, at 1316.

"When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different . . . . The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.*, at 1319.

See generally 2 C. Wright, Federal Practice and Procedure § 553 (1969).

[12] Elsewhere in its opinion, the Florida Supreme Court ruled that Florida appellate courts no longer may reverse convictions on the ground that the verdict was against the weight of the evidence. 397 So. 2d, at 1125. This ruling does not diminish the importance of the issue before us. Courts in other jurisdictions sometimes rely upon the weight of the evidence to over-

Having found that it could not "fairly conclude . . . that Tibbs' convictions were reversed on the grounds of evidentiary insufficiency," *id.*, at 1127, the Florida Supreme Court held that *Greene* and *Burks* do not bar retrial. Those decisions, the court believed, as well as *United States* v. *DiFrancesco*, 449 U. S. 117 (1980), interpret the Double Jeopardy Clause to preclude retrial after reversal of a conviction only when the appellate court has set the conviction aside on the ground that the evidence was legally insufficient to support conviction. Other reversals, including those based on the weight of the evidence or made in the "interests of justice," do not implicate double jeopardy principles.[13] We granted certiorari to review this interpretation of the Double Jeopardy Clause. 454 U. S. 963 (1981).

## II

In 1896, this Court ruled that a criminal defendant who successfully appeals a judgment against him "may be tried anew . . . for the same offence of which he had been con-

---

turn convictions. For example, some federal courts have interpreted Rule 33 of the Federal Rules of Criminal Procedure, which authorizes a new trial "if required in the interest of justice," to permit the trial judge to set aside a conviction that is against the weight of the evidence. *E. g., United States* v. *Lincoln, supra,* at 1319; *United States* v. *Indelicato,* 611 F. 2d 376, 387 (CA1 1979); *United States* v. *Turner,* 490 F. Supp. 583, 593 (ED Mich. 1979), affirmance order, 633 F. 2d 219 (CA6 1980), cert. denied, 450 U. S. 912 (1981); *United States* v. *Felice,* 481 F. Supp. 79, 90–91 (ND Ohio 1978).

[13] Three justices dissented from the court's decision to permit Tibbs' retrial. Chief Justice Sundberg suggested that the reversal in *Tibbs I* must have rested upon a finding of evidentiary insufficiency, because the Florida Supreme Court lacked authority to reweigh the evidence. He also rejected the majority's distinction between evidentiary weight and evidentiary sufficiency, proposing that the Double Jeopardy Clause should bar retrial whenever an appellate court reverses "for a substantive lack of evidence to support the verdict." 397 So. 2d, at 1128. Justice England merely stated that he would discharge Tibbs "in the interest of justice." *Id.*, at 1130. Justice Boyd concluded that *Tibbs I* had rested on a finding of evidentiary insufficiency and, accordingly, that Tibbs "should be forever discharged from the accusations made against him." 397 So. 2d, at 1131.

victed." *United States* v. *Ball*, 163 U. S. 662, 672. This principle, that the Double Jeopardy Clause "imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside," *North Carolina* v. *Pearce*, 395 U. S. 711, 720 (1969), has persevered to the present. See *United States* v. *DiFrancesco*, *supra*, at 131; *United States* v. *Scott*, 437 U. S. 82, 89–92 (1978). Two considerations support the rule. First, the Court has recognized that society would pay too high a price "were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *United States* v. *Tateo*, 377 U. S. 463, 466 (1964). Second, the Court has concluded that retrial after reversal of a conviction is not the type of governmental oppression targeted by the Double Jeopardy Clause. *United States* v. *Scott, supra*, at 91. See generally *United States* v. *DiFrancesco, supra*, at 131.[14]

*Burks* v. *United States* and *Greene* v. *Massey* carved a narrow exception from the understanding that a defendant who successfully appeals a conviction is subject to retrial. In those cases, we held that the Double Jeopardy Clause precludes retrial "once the reviewing court has found the evi-

---

[14] The rule also appears to coincide with the intent of the Fifth Amendment's drafters. James Madison's proposed version of the Double Jeopardy Clause provided that "[n]o person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." 1 Annals of Cong. 434 (1789). Several Representatives objected that this language might prevent a defendant from seeking a new trial after conviction. Representative Sherman, for example, observed that "[i]f the [defendant] was acquitted on the first trial, he ought not to be tried a second time; but if he was convicted on the first, and any thing should appear to set the judgment aside, he was entitled to a second, which was certainly favorable to him." *Id.*, at 753. Madison's supporters explained that the language would not prevent a convicted defendant from seeking a new trial, and the House approved Madison's proposal. *Ibid.* The Senate later substituted the language appearing in the present Clause. S. Jour., 1st Cong., 1st Sess., 71, 77 (1820 ed.). See generally *United States* v. *Wilson*, 420 U. S. 332, 340–342 (1975); Sigler, A History of Double Jeopardy, 7 Am. J. Legal Hist. 283, 304–306 (1963).

dence legally insufficient" to support conviction. *Burks*, 437 U. S., at 18; *Greene*, 437 U. S., at 24. This standard, we explained, "means that the government's case was so lacking that it should not have even been *submitted* to the jury." *Burks*, 437 U. S., at 16 (emphasis in original). A conviction will survive review, we suggested, whenever "the evidence and inferences therefrom most favorable to the prosecution would warrant the jury's finding the defendant guilty beyond a reasonable doubt." *Ibid.* See also *Greene, supra*, at 25. In sum, we noted that the rule barring retrial would be "confined to cases where the prosecution's failure is clear." *Burks, supra*, at 17.

So defined, the exception recognized in *Burks* and *Greene* rests upon two closely related policies. First, the Double Jeopardy Clause attaches special weight to judgments of acquittal.[15] A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial.[16] A reversal based on the insufficiency of the evidence has the same effect because it means that no rational factfinder could have voted to convict the defendant.

Second, *Burks* and *Greene* implement the principle that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks, supra*, at 11. This prohibition, lying at the core of the Clause's protections, prevents the State from honing its trial strategies and perfecting its evidence through successive attempts at conviction. Repeated prosecutorial sallies would unfairly burden the defendant and create a risk of conviction through sheer governmental perseverance.

---

[15] See *United States* v. *DiFrancesco*, 449 U. S. 117, 129 (1980); *United States* v. *Scott*, 437 U. S. 82, 91 (1978); *Arizona* v. *Washington*, 434 U. S. 497, 503 (1978); *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 571 (1977); *Fong Foo* v. *United States*, 369 U. S. 141, 143 (1962) *(per curiam)*.

[16] See, *e. g.*, *United States* v. *Martin Linen Supply Co., supra*; *United States* v. *Ball*, 163 U. S. 662, 666–671 (1896).

See *Green* v. *United States*, 355 U. S. 184, 187–188 (1957); *United States* v. *DiFrancesco*, 449 U. S., at 130. For this reason, when a reversal rests upon the ground that the prosecution has failed to produce sufficient evidence to prove its case, the Double Jeopardy Clause bars the prosecutor from making a second attempt at conviction.

As we suggested just last Term, these policies do not have the same force when a judge disagrees with a jury's resolution of conflicting evidence and concludes that a guilty verdict is against the weight of the evidence. See *Hudson* v. *Louisiana*, 450 U. S. 40, 44–45, n. 5 (1981). A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a "thirteenth juror" and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause.[17] Similarly, an appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.

A reversal based on the weight of the evidence, moreover, can occur only after the State both has presented sufficient

---

[17] See, *e. g.*, *Arizona* v. *Washington, supra*, at 509; *United States* v. *Sanford*, 429 U. S. 14, 16 (1976) *(per curiam); Johnson* v. *Louisiana*, 406 U. S. 356, 401–402 (1972) (MARSHALL, J., dissenting); *Downum* v. *United States*, 372 U. S. 734, 735–736 (1963); *Wade* v. *Hunter*, 336 U. S. 684, 689 (1949); *Keerl* v. *Montana*, 213 U. S. 135 (1909); *Dreyer* v. *Illinois*, 187 U. S. 71, 84–86 (1902); *Logan* v. *United States*, 144 U. S. 263, 298 (1892); *United States* v. *Perez*, 9 Wheat. 579 (1824).

Our decisions also make clear that disagreements among jurors or judges do not themselves create a reasonable doubt of guilt. As JUSTICE WHITE, writing for the Court in *Johnson* v. *Louisiana, supra*, explained, "[t]hat rational men disagree is not in itself equivalent to a failure of proof by the State, nor does it indicate infidelity to the reasonable-doubt standard." 406 U. S., at 362.

evidence to support conviction and has persuaded the jury to convict.  The reversal simply affords the defendant a second opportunity to seek a favorable judgment.[18]  An appellate court's decision to give the defendant this second chance does not create "an unacceptably high risk that the Government, with its superior resources, [will] wear down [the] defendant" and obtain conviction solely through its persistence.  *United States* v. *DiFrancesco, supra,* at 130.[19]

---

[18] The dissent suggests that a reversal based on the weight of the evidence necessarily requires the prosecution to introduce new evidence on retrial.  Once an appellate court rules that a conviction is against the weight of the evidence, the dissent reasons, it must reverse any subsequent conviction resting upon the same evidence.  We do not believe, however, that jurisdictions endorsing the "weight of the evidence" standard apply that standard equally to successive convictions.  In Florida, for example, the highest state court once observed that, although "[t]here is in this State no limit to the number of new trials that may be granted in any case, . . . it takes a strong case to require an appellate court to grant a new trial in a case upon the ground of insufficiency of conflicting evidence to support a verdict when the finding has been made by two juries."  *Blocker* v. *State,* 92 Fla. 878, 893, 110 So. 547, 552 (1926) (en banc).  The weight of the evidence rule, moreover, often derives from a mandate to act in the interests of justice.  See nn. 8 and 12, *supra.*  Although reversal of a first conviction based on sharply conflicting testimony may serve the interests of justice, reversal of a second conviction based on the same evidence may not.  See *United States* v. *Weinstein,* 452 F. 2d 704, 714, n. 14 (CA2 1971) ("We do not join in the . . . forecast that the granting of a new trial would doom the defendant and the Government to an infinite regression. . . . [I]f a third jury were to find [the defendant] guilty, we should suppose any judge would hesitate a long time before concluding that the interests of justice required still another trial"), cert. denied *sub nom. Grunberger* v. *United States,* 406 U. S. 917 (1972).  While the interests of justice may require an appellate court to sit once as a thirteenth juror, that standard does not compel the court to repeat the role.

[19] A second chance for the defendant, of course, inevitably affords the prosecutor a second try as well.  It is possible that new evidence or advance understanding of the defendant's trial strategy will make the State's case even stronger during a second trial than it was at the first.  It is also possible, however, that the passage of time and experience of defense counsel will weaken the prosecutor's presentation.  In this case, for example, more than eight years have elapsed since the crimes.  Nadeau's ability

While an appellate ruling based on the weight of the evidence thus fails to implicate the policies supporting *Burks* and *Greene*, it does involve the usual principles permitting retrial after a defendant's successful appeal. Just as the Double Jeopardy Clause does not require society to pay the high price of freeing every defendant whose first trial was tainted by prosecutorial error, it should not exact the price of immunity for every defendant who persuades an appellate panel to overturn an error-free conviction and give him a second chance at acquittal. Giving the defendant this second opportunity, when the evidence is sufficient to support the first verdict, hardly amounts to "governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." *United States* v. *Scott*, 437 U. S., at 91.

Petitioner Tibbs resists these arguments on the grounds that a distinction between the weight and the sufficiency of the evidence is unworkable and that such a distinction will undermine the *Burks* rule by encouraging appellate judges to base reversals on the weight, rather than the sufficiency, of the evidence. We find these arguments unpersuasive for two reasons. First, trial and appellate judges commonly distinguish between the weight and the sufficiency of the evidence.[20] We have no reason to believe that today's decision

---

to recall the events of February 3, 1974, may have diminished significantly, and a jury may be less willing to credit her identification of a man she saw almost a decade ago. When the State has secured one conviction based on legally sufficient evidence, it has everything to lose and little to gain by retrial. Thus, the type of "second chance" that the State receives when a court rests reversal on evidentiary weight does not involve the overreaching prohibited by the Double Jeopardy Clause.

[20] See, *e. g.*, *United States* v. *Lincoln*, 630 F. 2d, at 1319; *United States* v. *Weinstein*, *supra*, at 714–716; *United States* v. *Shipp*, 409 F. 2d 33, 36–37 (CA4), cert. denied, 396 U. S. 864 (1969); *Dorman* v. *State*, 622 P. 2d 448, 453–454 (Alaska 1981); *Ridley* v. *State*, 236 Ga. 147, 149, 223 S. E. 2d 131, 132 (1976); *State* v. *McGranahan*, —— R. I. ——, —— ——, 415 A. 2d 1298, 1301–1303 (1980); *Tyacke* v. *State*, 65 Wis. 2d 513, 521, 223 N. W. 2d 595, 599 (1974).

will erode the demonstrated ability of judges to distinguish legally insufficient evidence from evidence that rationally supports a verdict.

Second, our decision in *Jackson* v. *Virginia*, 443 U. S. 307 (1979), places some restraints on the power of appellate courts to mask reversals based on legally insufficient evidence as reversals grounded on the weight of the evidence. We held in *Jackson* that the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. The Due Process Clause, in other words, sets a lower limit on an appellate court's definition of evidentiary sufficiency.[21] This limit, together with our belief that state appellate judges faithfully honor their obligations to enforce applicable state and federal laws, persuades us that today's ruling will not undermine *Burks*. In sum, we conclude that the Double Jeopardy Clause does not prevent an appellate court from granting a convicted defendant an opportunity to seek acquittal through a new trial.[22]

---

[21] The evidence in this case clearly satisfied the due process test of *Jackson* v. *Virginia*. As we stressed in *Jackson*, the reviewing court must view "the evidence in the light most favorable to the prosecution." 443 U. S., at 319. The trier of fact, not the appellate court, holds "the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.* In this case, Nadeau provided eyewitness testimony to the crimes. If the jury believed her story, the State's presentation was more than sufficient to satisfy due process.

[22] We note that a contrary rule, one precluding retrial whenever an appellate court rests reversal on evidentiary weight, might prompt state legislatures simply to forbid those courts to reweigh the evidence. Rulemakers willing to permit a new trial in the face of a verdict supported by legally sufficient evidence may be less willing to free completely a defendant convicted by a jury of his peers. Acceptance of Tibbs' double jeopardy theory might also lead to restrictions on the authority of trial judges to order new trials based on their independent assessment of evidentiary weight. Although Tibbs limits his argument to appellate reversals, his contentions logically apply to a trial judge's finding that a conviction was against the

## III

We turn, finally, to apply the above principles to the present case. A close reading of *Tibbs I* suggests that the Florida Supreme Court overturned Tibbs' conviction because the evidence, although sufficient to support the jury's verdict, did not fully persuade the court of Tibbs' guilt. The plurality based its review on a Florida rule directing the court in capital cases to "review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is a ground of appeal or not." See n. 8, *supra*. References to the "interests of justice" and the justices' own "considerable doubt" of Tibbs' guilt mark the plurality's conclusions.[23] Those conclusions, moreover, stem from the justices' determination that Tibbs' testimony was more reliable than that of Nadeau. This resolution of conflicting testimony in a manner contrary to the jury's verdict is a hallmark of review based on evidentiary weight, not evidentiary sufficiency.

Any ambiguity in *Tibbs I*, finally, was resolved by the Florida Supreme Court in *Tibbs II*. Absent a conflict with the Due Process Clause, see n. 21, *supra*, that court's con-

---

weight of the evidence. Cf. *Hudson* v. *Louisiana*, 450 U. S. 40 (1981) (applying *Burks* v. *United States*, 437 U. S. 1 (1978), to trial judge's postverdict ruling that evidence was insufficient to support conviction). Endorsement of Tibbs' theory, therefore, might only serve to eliminate practices that help shield defendants from unjust convictions.

[23] At one point, the opinion does refer to " 'evidence which is not sufficient to convince a fair and impartial mind of the guilt of the accused beyond a reasonable doubt.' " 337 So. 2d, at 791 (quoting *McNeil* v. *State*, 104 Fla. 360, 361–362, 139 So. 791, 792 (1932)). This reference, however, occurs in a lengthy quotation from an earlier Florida decision. When read in context, it does not appear that the plurality actually applied this standard to the evidence in Tibbs' case. Moreover, the quotation containing this sufficiency language also speaks of evidence that is "not satisfactory" to the appellate court and that is not "substantial in character." *Ibid.* This language, in line with the remainder of *Tibbs I*, evidences a weighing of the evidence.

struction of its prior opinion binds this Court.[24]  In *Tibbs II*, of course, the court unequivocally held that *Tibbs I* was "one of those rare instances in which reversal was based on evidentiary weight."  397 So. 2d, at 1126 *(per curiam)*.  Thus, we conclude that Tibbs' successful appeal of his conviction rested upon a finding that the conviction was against the weight of the evidence, not upon a holding that the evidence was legally insufficient to support the verdict.  Under these circumstances, the Double Jeopardy Clause does not bar retrial.  Accordingly, the judgment of the Florida Supreme Court is

*Affirmed.*

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

As our cases in this area indicate, the meaning of the Double Jeopardy Clause is not always readily apparent.  See, *e. g.*, *Burks* v. *United States*, 437 U. S. 1 (1978) (overruling *Bryan* v. *United States*, 338 U. S. 552 (1950), *Sapir* v. *United States*, 348 U. S. 373 (1955), and *Forman* v. *United States*, 361 U. S. 416 (1960)); *United States* v. *Scott*, 437 U. S. 82 (1978) (overruling *United States* v. *Jenkins*, 420 U. S. 358 (1975)).  For this reason, we should begin with a clear understanding of what is at stake in this case.

To sustain the convictions in this case, the prosecution was required to convince the Florida Supreme Court not only that the evidence was sufficient under the federal constitutional

---

[24] In *Greene* v. *Massey*, 437 U. S. 19 (1978), we recognized that the meaning attached to an ambiguous prior reversal is a matter of state law.  In that case, we remanded a double jeopardy issue to the Court of Appeals for the Fifth Circuit, directing the court to consider the effect under state law of several peculiarities in the state court's opinion.  *Id.*, at 25–26, and nn. 8–10.  We even suggested that the Court of Appeals might "direct further proceedings in the District Court or . . . certify unresolved questions . . . to the Florida Supreme Court" to resolve these problems of state law. *Id.*, at 27.

standard announced in *Jackson* v. *Virginia*, 443 U. S. 307 (1979), but also that as a matter of state law, the verdict was not against the weight of the evidence. The Florida Supreme Court found the verdict to be against the weight of the evidence, thus holding that as a matter of state law the prosecution failed to present evidence adequate to sustain the convictions. Were the State to present this same evidence again, we must assume that once again the state courts would reverse any conviction that was based upon it.* The State was not prevented from presenting its best case because of some incorrect procedural ruling by the trial court; rather, the State had a full opportunity to present its case, but that case was not adequate as a matter of state law. If the State presents no new evidence, the defendant has no new or additional burden to meet in successfully presenting a defense: He may stand on, *i. e.*, repeat, what he has already presented. Thus, the only point of any second trial in this case is to allow the State to present additional evidence to bolster its case. If it does not have such evidence, reprosecution can serve no purpose other than harassment. The majority holds that reprosecution under these circumstances does not offend the double jeopardy provision of the Constitution. I do not agree.

The majority concedes, as it must under *Burks*, *supra*, that if the State's evidence failed to meet the federal due

---

*Only Chief Justice Sundberg, concurring in part and dissenting in part, reached this issue below: "Since the same evidence must be used, an appellate court would have no choice but once again to reverse a conviction because of our reversal under identical circumstances." 397 So. 2d 1120, 1130 (1981). Because the majority concluded that it would not in the future reverse convictions on grounds of evidentiary weight, it is not clear whether that court, were it presented with the exact same evidence in a *Tibbs III*, would follow its new rule and affirm or again reverse on "law of the case" grounds. I agree with the majority, however, that the peculiar procedural posture of this case does not affect our consideration of the issue because other jurisdictions, including the Federal Government, make use of a similar rule with respect to evidentiary weight.

process standard of evidentiary sufficiency, the Double Jeopardy Clause would bar reprosecution. The majority fails to explain why the State should be allowed another try where its proof has been held inadequate on state-law grounds, when it could not do so were it inadequate on federal-law grounds. In both cases the State has failed to present evidence adequate to sustain the conviction. The interests of the State in overcoming the evidentiary insufficiencies of its case would seem to be exactly the same in the two cases; the interests of the defendant in avoiding a second trial would also seem to be exactly the same in each case. Yet the majority holds that the Double Jeopardy Clause leads to different results in the two instances.

The majority offers two arguments in its attempt to distinguish the two cases. First, it emphasizes that the Double Jeopardy Clause "attaches special weight to judgments of acquittal." But in neither of the situations posited has there been a judgment of acquittal by the initial factfinder. In each instance, a reviewing court decides that, as a matter of law, the decision of the factfinder cannot stand. Second, the majority thinks it to be of some significance that when the evidence is determined to be insufficient as a matter of federal law, then no rational factfinder could have voted to convict on that basis. On the other hand, when the conviction is reversed on the basis of the state-law rule applying a "weight of the evidence" test, that "does not mean that acquittal was the only proper verdict." *Ante,* at 42. The constraints of the Double Jeopardy Clause, however, do not depend upon a determination that an "acquittal was the only proper verdict." The fact remains that the State failed to prove the defendant guilty in accordance with the evidentiary requirements of state law.

The majority opinion rests finally on a mischaracterization of the appellate court's ruling: "The reversal simply affords the defendant a second opportunity to seek a favorable judgment." *Ante,* at 43. But as I described above, it is not

the defendant who has the burden of coming up with a new case on retrial; it is the prosecution. The defendant has already demonstrated that a conviction based on the State's case, as so far developed, is "against the weight of the evidence."

Having concluded that the majority opinion fails to justify the distinction it draws, I too turn to "the policies supporting the Double Jeopardy Clause," *ante*, at 32, to determine whether this distinction is relevant. I do not believe it necessary to look beyond the articulation of those policies in the majority opinion itself to conclude that it is not:

> "*Burks* and *Greene* [v. *Massey*, 437 U. S. 19 (1978)] implement the principle that '[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' This prohibition, lying at the core of the Clause's protections, prevents the State from honing its trial strategies and perfecting its evidence through successive attempts at conviction. Repeated prosecutorial sallies would unfairly burden the defendant and create a risk of conviction through sheer governmental perseverance." *Ante*, at 41 (citations omitted).

These same policy considerations are at stake when a conviction is reversed on state-law grounds going to the adequacy of the evidence. The relevant question is whether the reversal is "'due to a failure of proof at trial' where the State received a 'fair opportunity to offer whatever proof it could assemble.'" *Hudson* v. *Louisiana*, 450 U. S. 40, 43 (1981) (quoting *Burks*, 437 U. S., at 16). That the proof fails on state-law, rather than federal-law, grounds is immaterial to these policy considerations. Thus, the relevant distinction is between reversals based on evidentiary grounds and those based on procedural grounds: Only in the latter case can the State proceed to retrial without offending the deeply in-

grained principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green* v. *United States*, 355 U. S. 184, 187 (1957).

It must also be noted that judges having doubts about the sufficiency of the evidence under the *Jackson* standard may prefer to reverse on the weight of the evidence, since retrial would not be barred.   If done recurringly, this would undermine *Jackson*, *Burks*, and *Greene*.   But under *Burks* and *Greene*, retrial is foreclosed by the Double Jeopardy Clause if the evidence fails to satisfy the *Jackson* standard.   Hence, the *Jackson* issue cannot be avoided; if retrial is to be had, the evidence must be found to be legally sufficient, as a matter of federal law, to sustain the jury verdict.   That finding must accompany any reversal based on the weight of the evidence if retrial is contemplated.   The upshot may be that appellate judges will not be inclined to proclaim the evidence in a case to be legally sufficient, yet go on to disagree with the jury and the trial court by reversing on weight-of-the-evidence grounds.   Indeed, in this case, the Florida Supreme Court declared that prospect to be an anomaly and a mistake and proclaimed that it would never again put itself in this position.

With all due respect, I dissent.