WISE, Presiding Judge.
The appellant, Joseph Renney, was indicted for the capital offense of murder during a sexual abuse, felony-murder, sexual torture, and first-degree sexual abuse. He was convicted of manslaughter, a violation of § 13A-6-3(a)(l), AIa.Code 1975; sexual torture, a violation of § 13A-6-65.1(a)(1), Ala.Code 1975; and first-degree sexual abuse, a violation of § 13A-6-66(a)(1), Ala.Code 1975. The trial court sentenced him to serve concurrent terms of twenty years in prison on the manslaughter conviction, life in prison on the sexual torture conviction, and ten years in prison on the sexual abuse conviction. Renney filed a motion for a new trial, which was denied by operation of law. See Rule 24.4, Ala. R.Crim. P. This appeal followed.
The State presented evidence that Ren-ney and the victim, A.H., lived together for about five years. It also presented evidence that the victim died on April 25, 2005.
Joyce Kiker, the victim’s mother, testified that, on March 19, 2005, Renney telephoned her and told her that the victim said her stomach was hurting and that the victim wanted him to take her to the doctor. When he explained that he could not drive her because he had been drinking, Kiker said she would be there shortly. However, she testified that Renney telephoned her again and said that the victim was not going to go to the doctor because she had had a bowel movement and felt better.
Kiker testified that Renney telephoned her on March 23, 2005, and told her that the victim was at Druid City Hospital (“DCH”) and that she was going to have emergency surgery. She saw the victim briefly before her surgery and then saw her again after she returned from surgery. *983 Kiker testified that Renney was in the room after the victim returned from surgery and that the nurses made him leave the room because the victim’s blood pressure kept going up. After he left, the victim’s blood pressure went back down.
Kiker testified that the victim suffered from manic depression and bipolar disorder. She also testified that she had been hospitalized for those illnesses before and that she took medication to treat them. She further testified that the victim had been off of her medication for approximately three weeks before she was hospitalized.
Kiker testified that she observed bruises on the victim’s face and body after her surgery. She also testified that the victim had told her on previous occasions that she had fallen, that the victim had fallen a lot of times, and that she had cautioned the victim about drinking while she was taking her medication. Kiker further testified that the victim did not mention anything to her about having fallen and sustaining the injuries for which she was hospitalized as a result of a fall. Rather, she testified that, about two weeks after her surgery, the victim told her what had caused the injuries. She talked to law enforcement officers about what the victim had said. Afterward, officers interviewed the victim and ultimately arrested Renney.
Cynthia Robinson testified that she was working as a licensed practical nurse in the emergency room at Hale County Hospital on March 22, 2005, when the victim came into the emergency room. At that time, the victim was vomiting blood and had bruises on her forehead, cheek, and lip. Robinson testified that Renney took the victim to the hospital and reported that the victim had fallen two days before and that she had gotten worse and started throwing up blood. She further testified that the victim was diagnosed as having trauma to the small bowel with gas in the left colon and trauma to her face. Finally, she testified that the victim was at that hospital for only a short time because her condition worsened and she was transferred to DCH.
Donna Dowdy testified that she was working in the emergency room at Hale County Hospital on March 22, 2005, when the victim came in for treatment. She also testified that, at that time, the victim was complaining of nausea and vomiting and that she said she had fallen down some stairs. She further testified that the victim had bruises on her face, chest, and back.
Dowdy testified that Renney accompanied the victim to the hospital and that he appeared to be nervous and hovering over the victim. She also testified that Renney answered for the victim when they asked the victim questions and stated that she drank a lot, that she had been drinking, and that she had fallen down some stairs a few days before. Finally, Dowdy testified that the victim did not appear to be delusional or off of her medication at that time.
Leigh Mercer testified that she was a nurse and that she was the trauma case manager at DCH when the victim was admitted to the hospital in March 2005. When she interviewed the victim, her mother and Renney were in the room with her. Mercer testified that the victim had bruises on her face and arms and other parts of her body. When she asked about how she incurred the injuries, the victim did not initially respond, but looked at Renney. However, at some point during the conversation, she said that she had fallen up some steps. Mercer testified that Renney then moved close to her and to the victim and that she asked him to move because he was making her uncomfortable, but he did not move. Afterward, the victim did not answer any more ques *984 tions and, when she asked if she was afraid, the victim indicated that she was.
Mercer testified that, after she stopped questioning the victim, Dr. Wallace came in and explained that they were going to perform emergency surgery on the victim. Around that time, Renney talked about what he wanted done for the victim and stated that he needed a do not resuscitate order.
Mercer testified that, later that afternoon, she advised Renney and the victim’s mother that they had contacted the Department of Human Resources and law enforcement officers. Afterward, Renney told her that he had been drinking, that he may have injured the victim, and that he had contacted a facility about getting some help.
Mercer testified that, sometime after the victim had surgery, she told her that Ren-ney had injured her. Specifically, she testified that the victim “said he stuck a stick up her butt and hurt her and beat her.” (R. 351.) Finally, she testified that the victim was alert and oriented and did not appear to be delusional when she made that statement.
Christy Bush testified that she was a nurse in the trauma intensive care unit at DCH and that the victim was in her care after her surgery. She also testified that the diagnosis from the surgery was that the victim had an exploratory laparotomy and a colostomy, that she had suffered blunt force trauma to her abdomen, and that that trauma had perforated her bowel. She further testified that the victim had bruises on her face, her arms, the backs of her legs, and her back.
Bush testified that she noticed that the victim became anxious and that her heart rate and blood pressure went up when Renney arrived in her room. She asked him to step out so she could assess the victim, and he did. Bush further testified that, after Renney left the room, she reassured the victim that she was going to take care of her, and the victim calmed down. She also testified that Renney seemed to glare at the victim rather than comfort her.
Bush testified that, while the victim was intubated, she asked if Renney had injured her and that the victim blinked once and squeezed her hand once to indicate that he had. She also asked if he had hurt her, and the victim gave the same response. Bush further testified that, after the victim was extubated, she asked if Renney had injured her, and the victim indicated that he had. Specifically, she stated that the victim said that Renney had hurt her and beat her.
Officer Maurice Poleon of the Greensboro Police Department testified that he saw the victim after she got out of surgery and asked her if she knew who had injured her. Although she could not speak, the victim hesitated and then nodded to indicate that she did. Poleon let the victim rest and went to talk to her family members for a while. Afterward, he spoke to the victim again and then had other officers speak to Renney.
Poleon testified that he spoke to the victim again the next day and a few days later. Based on information the victim provided, he went to Renney and victim’s residence and located a shovel handle the victim had told him about. The handle was in a puddle of water when he recovered it.
Dr. Patrick Bruce Atkins, a clinical psychiatrist, testified on behalf of the defense and stated that he had treated the victim for about three weeks in 1996 when her treating psychiatrist was out of town. He testified that she had been diagnosed with bipolar/manic-depressive disorder and that she was prone to psychotic states. Atkins *985 testified that the condition could result in broad mood swings, hallucinations, and delusions of grandeur or paranoia.
Atkins reviewed the victim’s mental health records and testified that they showed that she was not always compliant about taking her medication and that she drank alcohol in excessive amounts. He also reviewed the medical records from her hospitalization and surgery and testified that they showed that the victim had to be reoriented repeatedly as to time, place, situation, and person and that she was not capable of understanding instructions. Based on his review of the records, Atkins testified that he did not believe the victim understood what she was doing and was not capable of communicating adequately for a few days after her surgery and particularly during the times when she accused Renney of injuring her.
Dr. James Lauridson, a forensic pathologist, testified that he was previously the chief medical examiner for the Alabama Department of Forensic Sciences. He also testified that Dr. Art Shores performed the autopsy of the victim’s body on April 27, 2005, but did not complete the autopsy report. Lauridson further testified that he completed the autopsy report in October 2005 after reviewing the notes, diagrams, and photographs Shores had made. He signed the autopsy report and listed the final diagnosis as traumatic rupture of the sigmoid colon, listed the cause of death as complications of abdominal trauma, and listed the manner of death as homicide.
Lauridson testified that, before the trial, defense counsel contacted him and asked him to review the victim’s complete medical records, including Dr. Wallace’s surgical notes, which he had not had before. Wallace had diagnosed the victim as suffering from pneumoperitoneum, or air in the abdominal cavity, with a history of a fall. Because there was also a concern that some type of perforation had occurred in the bowel or another organ, Wallace performed an exploratory laparotomy in which he opened the abdomen to try to determine what was causing the air to be in the victim’s abdomen.
Lauridson testified that Wallace found peritoneum fluid that resulted in peritonitis, which is an infection around all of the abdominal organs. He also observed multiple areas of staining and exudate on the small bowel and staining on the colon. Lauridson testified that the records indicated that there was a large amount of staining that was consistent with leakage and that Wallace checked thoroughly for a perforation or injury, but could not find one.
Lauridson testified that Wallace removed a segment of colon and performed a colostomy on the victim, that the hospital pathologist examined the portion of the colon that had been removed, and that the pathologist did not find anything wrong with that portion of the colon. He also testified that he later examined slides that were prepared by the hospital pathologist and that he did not find any signs of injury or disease on that portion of the colon.
Lauridson testified that the victim died from complications of acute peritonitis. He also testified that peritonitis can be caused by a ruptured appendix, bowel in-farctions, divertic out pouches of the colon, or foreign bodies that perforate the bowel. Lauridson testified that it could be caused by spontaneous bacterial peritonitis, which is sometimes seen in people who have alcoholic liver disease. Based on the victim’s history of abusing alcohol and some abnormal liver function tests, he testified that spontaneous bacterial peritonitis could have been considered as a possible cause of the peritonitis in this case.
*986 Lauridson testified that it would have been physically impossible for the shovel handle to have caused the damage to the victim’s colon. He also testified that there was not any evidence of a perforation to the victim’s rectum or colon. Based on his further review, Lauridson testified that he believed the proper final diagnosis was complications of acute peritonitis, with no evidence of trauma, and that the manner of death was undetermined.
On cross-examination, Lauridson admitted that Shores described observing an anaerobic smell in the peritoneum cavity, which indicated that bacteria from the bowel had gotten into the peritoneum cavity. He also admitted that the victim did not have advanced liver disease and that spontaneous peritonitis was very unlikely. Lauridson further admitted that the most likely cause of the peritonitis was perforation of the bowel and that, if a small nick had occurred in the bowel, it would have started healing fairly quickly. However, he maintained that a perforation was not ever located.
In rebuttal, Poleon testified that he spoke to the victim several times about what had happened. He also testified that she told him that Renney “ended up forcefully pushing a stick up her rectum and ... pushed and pushed and pushed.” (R. 587.) Finally, he testified that she told him and the nurses that same story several times.
Deborah Dobb, a forensic biologist with the Alabama Department of Forensic Sciences, testified that she examined the shovel handle for evidence of blood, DNA, and semen. She also testified that she found two stains near the jagged end and tested them for the presence of blood, but the test was negative. Dobb further testified that she detected DNA on the rounded end of the handle, but she was not able to type it. Finally, she explained that moisture will cause DNA to break down more quickly.
Dr. Kenneth Snell, the chief medical examiner for the Alabama Department of Forensic Sciences, performed a cursory review of the autopsy report in this case. He testified that the report indicated that there was a contusion or bruise extending from the pectinate line that divides the rectum and colon approximately three inches into the sigmoid colon. He also testified that, although Shores saw contusions, he did not see evidence of a perforation.
Snell testified that peritonitis can be caused by a rupture of the intestines, an ulcer that eroded and broke through the mucosa and released stomach contents into the peritoneum, trauma to the mucosal area, spontaneous bacterial peritonitis in patients who suffer from hepatic cirrhosis or fibrosis of the liver or who do not have a functioning spleen, the opening of the peritoneum to outside air through dialysis, a nick in the abdominal peritoneum cavity caused by a surgical procedure, or a ruptured appendix. Based on the evidence presented, he stated that there were not any indications that the victim had suffered spontaneous peritonitis. Snell testified that a fall could cause a bruise to the intestines. However, he testified that the braises on the rest of the victim’s body were not consistent with such a fall.
Snell testified that the pathologist could have missed a small hole in the portion of the colon that was removed and examined. He also testified that there could have been mucosal damage in the three-inch area of contusion that was previously mentioned or that damage could have been in more than one area. Snell further testified that the area of staining Wallace observed suggested that there might have been a perforation or an area of mucosa with trauma that allowed for seepage *987 across it. Based on his observations, he testified that he believed the cause of death was complications from abdominal trauma.
Snell examined the shovel handle and testified that it could have been put in the victim’s rectum and could have caused an abrasion to the mucosa that would have allowed seepage without causing an actual perforation. He also testified that the handle could have caused abrasions in several places.
Snell testified that autopsy reports may be amended or changed if additional information becomes available. He also testified that, if Lauridson obtained additional information that caused him to change his opinion, he should have notified the department so appropriate actions could be taken. Finally, he testified that Lauridson did not make such a disclosure to the department.
I.
Renney argues that the State did not present sufficient evidence to support his convictions.
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
“ ‘In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’ Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
[[Image here]]
“ ‘ “The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a ver- *988 diet, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’ Granger [v. State], 473 So.2d [1137,] 1139 [ (Ala.Crim.App.1985) ].
“... ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
“ ‘[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cum-bo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).’
“Ward [v. State], 610 So.2d [1190,] 1191-92 [ (Ala.Crim.App.1992) ].”
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997). Further,
“ ‘[i]ntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’ McCord v. State, 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908).”
French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
“ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’ Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985).”
Oryang v. State, 642 So.2d 989, 994 (Ala.Crim.App.1994).
“A person commits the crime of manslaughter if:
“(1) He recklessly causes the death of another person.... ”
§ 13A-6-3(a), Ala.Code 1975.
“A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a *989 reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto.”
§ 13A-2-2(3), Ala.Code 1975.
“A person commits the crime of sexual torture:
“(1) By penetrating the vagina or anus or mouth of another person with an inanimate object by forcible compulsion with the intent to sexually torture or to sexually abuse.”
§ 13A-6-65.1(a), Ala.Code 1975.
“A person commits the crime of sexual abuse in the first degree if:
“(1) He subjects another person to sexual contact by forcible compulsion .... ”
§ 13A-6-66(a), Ala.Code 1975.
Based on the evidence presented, the jury could have reasonably concluded that Renney penetrated the victim’s anus with an inanimate object by forcible compulsion with the intent to sexually torture or sexually abuse her. It could also have reasonably concluded that, in doing so, Renney recklessly caused injuries that ultimately resulted in the victim’s death. Therefore, we conclude that there was sufficient evidence to support his convictions for manslaughter and sexual torture.
However, in Gunter v. State, 665 So.2d 1008, 1012 (Ala.Crim.App.1995), this court held that sexual abuse is a lesser included offense of sexual torture, noting specifically that “[t]he definition of sexual torture incorporates sexual abuse by reference by using the phrase ‘with the intent to sexually torture or sexually abuse.’ (Emphasis added.).” We also held that, “[ujnder the definition of ‘sexual contact,’ ‘any touching of the sexual or other intimate parts’ should be construed literally to mean any touching, whether directly or using an inanimate object.” Gunter, 665 So.2d at 1013.
In this case, we are compelled to conclude that first-degree sexual abuse is a lesser included offense of sexual torture under the facts of this case and that Ren-ney’s convictions for both offenses violate double jeopardy principles. See Straughn v. State, 876 So.2d 492 (Ala.Crim.App.2003). Therefore, Renney’s conviction and sentence for first-degree sexual abuse must be set aside.[1]
II.
Renney also argues that the trial court erred when it did not allow a juror to continue to ask questions of Lauridson. However, he did not object on this ground at trial. Therefore, this argument is not properly before this court. See Ex parte Malone, 12 So.3d 60 (Ala.2008).
III.
Finally, Renney appears to challenge the weight of the evidence presented in his case. However,
“[i]n Johnson v. State, 555 So.2d 818, 819-20 (Ala.Cr.App.1989), this court noted the difference in ‘sufficiency’ and ‘weight’ as follows:
“‘The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, “viewing the evidence in the light most favorable to the prosecution, [a] rational factfinder *990 could have found the defendant guilty beyond a reasonable doubt.” Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2215, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App.1984).
[[Image here]]
“ ‘In contrast, “[t]he ‘weight of the evidence’ refers to ‘a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.’ ” Tibbs v. Florida, 457 U.S. at 37-38 [102 S.Ct. at 2216] (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala.1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala.1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). ‘“[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.’ ” Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App.1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)).[’]
“(Emphasis in original.) See Smith v. State, 604 So.2d 434 (Ala.Cr.App.1992); Pearson v. State, 601 So.2d 1119 (Ala.Cr.App.1992); Curry v. State, 601 So.2d 157 (Ala.Cr.App.1992).”
Zumbado v. State, 615 So.2d 1223, 1240-41 (Ala.Crim.App.1993). We will not invade the province of the jury and reweigh the evidence in this case. Therefore, to the extent Renney challenges the weight of the evidence, his argument is not well-taken.
For the above-stated reasons, we affirm Renney’s convictions and sentences for manslaughter and sexual torture, but reverse his conviction and sentence for first-degree sexual abuse. Accordingly, we remand this case for the trial court to set aside Renney’s conviction and sentence for first-degree sexual abuse. The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 42 days after the release of this opinion.
AFFIRMED AS TO CONVICTIONS FOR MANSLAUGHTER AND SEXUAL TORTURE; REVERSED AND REMANDED WITH INSTRUCTIONS AS TO CONVICTION FOR FIRST-DEGREE SEXUAL ABUSE*
WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.

. Because of our holding in this regard, we need not address Renney’s challenges to his first-degree sexual abuse conviction.

 Note from the reporter of decisions: On April 16, 2010, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On May 7, 2010, that court denied rehearing, without opinion. On June 25, 2010, the Supreme Court denied certiorari review, without opinion (1091179).