The STATE of Ohio, Appellee,

v.

CHISM, Appellant.

[Cite as *State v. Chism* (1993), 92 Ohio App.3d 317.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 64286.

Decided Dec. 13, 1993.

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *John R. Kosko*, Assistant Prosecuting Attorney, for appellee.

*Mark B. Marein*, for appellant.

PATTON, Presiding Judge.

Defendant-appellant Tony Chism ("defendant") appeals from his conviction of one count of murder (R.C. 2903.02). He challenges his conviction as violative of the Fourth Amendment and as being against the manifest weight of the evidence. For the following reasons, we affirm.

The relevant facts adduced at the suppression hearing and trial are as follows:

The murder victim, Zurkita Downey, the defendant's ten-month-old daughter, died as a result of multiple and repeated blows to her skull.

Dr. Robert Challener, Chief Deputy Coroner of Cuyahoga County, performed an autopsy on the victim. He testified the autopsy revealed extensive hemorrhaging in the brain as the result of a blunt force injury which produced extreme trauma. An examination of the victim's brain revealed tearing of the tissue and bruising caused by bone fractures of the skull. Dr. Challener testified that the type of force necessary to do this kind of damage is extreme and forceful. He surmised that "swinging" the victim and forcefully impacting her head on a padded surface such as a carpet could produce the injuries the victim suffered.

Dr. Challener also stated that the type of damage to the brain was consistent with the victim's head striking a carpeted floor where the head would suddenly stop but the brain would continue forward causing trauma and tearing of the blood vessels. He concluded by unequivocally ruling out that the victim's injuries could have been produced by a slap to the head.

Police Officer Cristina Cottom of the Cleveland Police Department testified at the suppression hearing. She stated that, on December 13, 1991, while on basic patrol, she received a radio broadcast for "a male unable to wake a child." The time of day was approximately 8:30 a.m. Officer Cottom responded to the call, thinking it was a medical emergency. Upon arriving at the scene, she was greeted outside by the defendant. The defendant told Officer Cottom that he had summoned the police and, in response to Officer Cottom's query as to what had happened, the defendant stated he could not wake up his daughter. Officer Cottom wished to conduct an interview with the defendant. Due to the cold December weather, Officer Cottom placed him in the patrol car. She patted him down for officer safety prior to inviting him in the police vehicle. At this time, the defendant was not under arrest nor was he a suspect for any crime. Officer Cottom, at this point, still thought it was a medical emergency.

Once inside the zone car, he stated the ambulance picked up his daughter because she was not able to breathe. The defendant then told Officer Cottom that, while watching television with the victim, she began to cry and crawl towards him. The defendant stated he slapped the victim twice.

Officer Cottom's supervisor then came on the scene. She relayed to her supervisor the information gathered from her interview with the defendant. As a result, the defendant was taken out of the zone car, read his constitutional rights and arrested.

The defendant was transported to the police station, where he voluntarily made a written statement. In his statement, the defendant described the events as follows:

"Q. When you hit your daughter, ZURKITA DOWNEY, how did you hit her?

"A. I hit her with my left hand first, then my right hand, then I picked her up and she was breathing with short breaths like after you cry. I put her on the floor and gave her a bottle. After I gave her the bottle she didn't breath like that anymore. She went to sleep and every once in awhile she'd breath like that. The next time I woke up about 8 o'clock she wasn't breathing and she had one eye opened like looking at me.

"Q. Tell us the name of the first person you called when you thought something was wrong?

"A. Corine Annette McIntosh, my sister.

"Q. Who[m] did Corine Annette McIntosh get?

"A. She ran downstairs and got Corinne [sic] Austin, we call her Wendy.

"Q. When the slapping incident occurred, had you been using any medication, alcohol or drugs?

"A. I had drunk 2 40 oz. 11–11 Malt Liquor.

"Q. When you were done drinking the 2 40 oz. 11–11 Malt Liquor what did you do with the bottles?

"A. Put them in the garbage in the kitchen by the sink.

"Q. Did you hit ZURKITA DOWNEY before or after you drank the beer?

"A. I hit her after I drank the beer.

"Q. When did you start to drink the beer?

"A. I drunk the beer after I got situated, I got a phone call from my cousin Rose, she told me about toys for the kids at Community College and some coats. I was walking my neice [sic] to sleep and as I was walking her to sleep I was taking a drink. She went to sleep in about a half hour. That's when I put my babies to sleep. And started watching boxing on USA Network, then once they went to sleep and that's when I ran some bath water, I turned the music on the radio. I was taking a bath and my sister called checking on the kids. This was Corine Annette, I told her I was taking a bath. I got out the tub [sic] and

started watching boxing again and I drank the rest of my 40 oz, [*sic* ] beer. Then I got the other one out of the freezer, I drank some of it, about half the bottle and poured the rest down the sink. I dozed off, that's when I woke up and put my daughter ZURKITA on the couch with me, that's when she had started the whining and crying and I told her to shut up and then just like I told you at the beginning that's when I hit her."

The defendant timely appeals his conviction of murder.

## I

In the defendant's first assignment of error, he argues his motion to suppress statements made to Officer Cottom during the initial interview in the zone car should have been granted. Specifically, he contends he was illegally detained when he made his confession. We disagree.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. * * * "

The United States Supreme Court in *United States v. Mendenhall* (1980), 446 U.S. 544 at 553, 100 S.Ct. 1870 at 1877, 64 L.Ed.2d 497 at 509, stated, "[w]e adhere to the view that a person is 'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards."

The issue in this case is whether the defendant was illegally seized in the officer's zone car in violation of the Fourth Amendment or whether the defendant voluntarily entered the zone car and agreed to be interviewed. Voluntariness is a "question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 863.

In this case, there was no need to invoke constitutional safeguards prior to the defendant's arrest. The defendant's encounter with Officer Cottom was completely consensual and voluntary. The defendant was not asked what happened because he was a suspect stopped for the suspicion of criminal activity. Quite the contrary. Officer Cottom testified that she was merely investigating what she thought was a medical emergency.

The defendant voluntarily approached the zone car and told Officer Cottom he was the one who made the emergency call for his daughter who could not breathe. As officers are certainly authorized to do, she began her inquiry about the events that happened. Because it was a cold winter morning, she asked the defendant to step into her vehicle, but first checked him for weapons for her

safety. The defendant was not under arrest at this time nor was he even a suspect in any crime.

Officer Cottom was gathering information when the defendant admitted he hit the victim twice the night before. The defendant was not in custody and no interrogation was being conducted. At no time before the defendant's admission did Officer Cottom suspect that the defendant had committed any crime—or even that a crime had been committed. This factual scenario differs drastically from those cases cited by the defendant that invoke the Fourth Amendment safeguards when an individual is forcibly detained by law enforcement officials based upon some suspicion of criminal activity.

From this record, we cannot say the defendant was "seized" at any point prior to the police's obtaining probable cause to make an arrest. We find this case is not the type that would trigger Fourth Amendment protection.

Accordingly, the first assignment of error is overruled.

## II

In the defendant's second assignment of error, he argues the verdict is against the manifest weight of the evidence. Specifically, he contends there was no evidence that anyone observed the defendant strike the victim.

In *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, the court set forth the test to be utilized when addressing the issue of manifest weight of the evidence. The *Martin* court stated as follows:

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * * See *Tibbs v. Florida* (1982), 457 U.S. 31, 38, 42 [102 S.Ct. 2211, 2218, 72 L.Ed.2d 652, 661]." *Martin, supra,* 20 Ohio App.3d at 175, 20 OBR at 219, 485 N.E.2d at 720–721.

Moreover, it must be stressed that the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. This court will not reverse a verdict where there is substantial evidence upon which a trier of fact could reasonably conclude that all the elements of the offense have been proven beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132.

The trier of fact is entitled to believe or not to believe the testimony of the state's witnesses and/or the defense witnesses. *State v. Antill* (1964), 176

Ohio St. 61, 26 O.O.2d 366, 197 N.E.2d 548. The trier of fact should consider the demeanor of the witness and the manner in which he testifies, his connection or relationship with the parties, and his interest, if any, in the outcome. *Id.* at 67, 26 O.O.2d at 369, 197 N.E.2d at 553.

■ In this case, while the evidence does not reveal anyone observing the defendant strike the victim, it does establish that the defendant called "911" and told the operator he thought he killed his baby. Further, he in fact confessed to slapping the victim on the night in question. Moreover, the defendant's upstairs neighbor testified that, in the early morning hours of December 12, 1991, he heard a child whimpering downstairs. He then testified he heard a "thumping noise" like someone being slammed to the floor. The noise was so loud it startled the defendant's neighbor. He recalled that after the loud thumping noise, the child's whining stopped.

The defendant's sister Corine McIntosh testified she lived with the defendant, his two daughters, her cousin and her boyfriend. McIntosh also had a two-and-one-half-month-old baby that lived with all of them.

McIntosh testified that, on the night in question, she left the house at approximately 8:30 p.m. and left the defendant home alone to babysit the three children. When she came back home at about 1:00 a.m. or 2:30 a.m., she saw the defendant sleeping on the floor with his daughters. McIntosh noticed that the victim was "whining."

Sometime during the following morning, the defendant came in to her room and told her he thought the victim was dead. Thereafter, the defendant called 911.

The evidence established that the defendant was alone with the victim and the other two small children. The defendant's neighbor heard a child whining and then a loud thumping noise as if someone was being slammed to the ground. The defendant admitted striking the victim.

The coroner testified that the victim's skull was cracked in five places; her brain tissue was severely torn; and her extreme injuries were consistent with massive blunt force such as being thrust to the floor.

While no one testified they saw the defendant strike the victim, the conviction of murder is certainly not against the manifest weight of the evidence.

Accordingly, the second assignment of error is overruled.

*Judgment affirmed.*

HARPER and KRUPANSKY, JJ., concur.