[Cite as *State v. Shaw*, 2009-Ohio-2614.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO.  9-08-68

    v.

PERCY D. SHAW,                         O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 08-CR-111

**Judgment Affirmed**

Date of Decision:    June 8, 2009

APPEARANCES:

    *Kevin P. Collins*  for Appellant

    *Brent W. Yager*  for Appellee

**WILLAMOWSKI, J.**

{¶1} The defendant-appellant, Percy Shaw, appeals the judgment of the Marion County Common Pleas Court convicting him of murder and having weapons while under disability following a jury's determination of guilt. On appeal, Shaw contends the convictions were against the manifest weight of the evidence. For the reasons set forth herein, the judgment of the trial court is affirmed.

{¶2} On March 19, 2008, the Marion County Grand Jury indicted Shaw on one count of having weapons while under disability, a violation of R.C. 2923.13(A)(3), a third-degree felony. On April 30, 2008, the grand jury indicted Shaw on two counts of murder, violations of R.C. 2903.02(B) and R.C. 2903.02(A), respectively. Each murder charge carried a three-year gun specification. The court subsequently joined the indictments on motion of the state, and Shaw pled not guilty at arraignment. A jury trial was held from September 22, 2008 through September 26, 2008. The jury found Shaw guilty of each offense, including the gun specifications. At the sentencing hearing on November 10, 2008, the court found the murder convictions to be allied offenses of similar import and merged count two into count three. The court sentenced Shaw to consecutive sentences of five years in prison on the first count and an indeterminate sentence of 15 years to life on the third count; an aggregate

Case No. 9-08-68

indeterminate sentence of 23 years to life. Shaw appeals the judgment of the trial

court and raises two assignments of error for our review.

## First Assignment of Error

**Defendant-Appellant's conviction for murder is contrary to the manifest weight of evidence.**

## Second Assignment of Error

**Defendant-Appellant's conviction for having a weapon under disability is contrary to the manifest weight of evidence.**

{¶3} A challenge based on the manifest weight of the evidence requires

the court to sit "as a 'thirteenth juror.'" *State v. Thompkins* (1997), 78 Ohio St.3d

380, 387, 678 N.E.2d 541, quoting *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102

S.Ct. 2211, 72 L.Ed.2d 652.

> **Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."**

Id. at 387, quoting Black's Law Dictionary (6 Ed.1990), at 1594. When an

appellant challenges a conviction based on the weight of the evidence, the court

must review the entire record, weigh the evidence and "all reasonable inferences,"

consider witness credibility, and determine whether "the jury clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three appellate judges must concur. *State v. Michaels* (Dec. 15, 1999), 3d Dist. No. 13-99-41, citing *Thompkins*, at 389.

{¶4} Shaw was convicted of violating R.C. 2903.02(A), which states, "[n]o person shall purposely cause the death of another[.]" He was also convicted of violating R.C. 2923.13(A)(3), which states:

> **Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:**
>
> **\* \* \***
>
> **The person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been an offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.**

{¶5} The defense did not present any witnesses or evidence during trial. Instead, counsel attempted to impeach witnesses, implied that the victim's death was caused by a kick or punch or that his heart had otherwise stopped before he

was shot, and questioned the identity of the shooter, specifically targeting Eric Creagh as the guilty party. At trial, the following evidence was produced.

{¶6} The first witness to testify for the state was Floran Clark. She told the jury that she had been driving north on Blaine Avenue when she saw three men and something lying in the roadway. Trial Tr., Jan. 21, 2009, at 197. She then heard five or six gun shots. Id. Clark did not stop her vehicle but did call 9-1-1. Id. at 197; 202. She told the jury she was unable to determine the gender or race of the suspects as the street light either was not working or there was not a street light in that area. Id. at 205-206. On cross-examination, Clark stated that there had been either three or four suspects in the area. Id. at 206. Several other people who lived in the area testified that they heard gun shots, and a few of those witnesses stated that they observed two individuals running north following the shooting. Id. at 209-230.

{¶7} Kristen Lehman was employed as a dispatcher at the Marion City Police Department. Between 1:11 and 1:13 a.m., she ran a warrant check on the victim, Trevor Herron, after an officer had stopped him. Id. at 234. At 1:20 a.m., she received the first call reporting a shooting at the intersection of Blaine Avenue and Church Street. Id. At 1:23 a.m., the first officer arrived at the scene. Id. at 235.

{¶8} Mike Shade, a lieutenant with the Marion City Police Department, testified that he was the third officer to respond to the scene of the shooting. Id. at 238; 246. Shade indicated that the officers located seven shell casings, six pit marks in the asphalt, and three bullet fragments in close proximity to where the victim's body had lain. Id. at 242-244.

{¶9} Todd Monnette, a patrol officer with the Marion City Police Department, testified that prior to the shooting, he had stopped Herron as he walked westbound near the corner of West Center Street and Garden Street. Id. at 247. Monnette also assisted with the collection of evidence at the scene of the shooting. Id. at 251.

{¶10} Patrolman Shane Gosnell of the Marion City Police Department was the first officer to respond to the scene of the shooting, and after attending to Herron to the extent he could, he assisted with the collection of evidence and with the canine search for the weapon. Id. at 268-269; 279.

{¶11} Tae Lyong An, a forensic pathologist with the Franklin County Coroner's Office, testified that one bullet entered the back of Herron's left shoulder. Id. at 284. The bullet traveled in a downward and slightly forward direction, lacerating Herron's ascending aorta and puncturing his right lung before coming to rest below his right nipple. Id. at 285-287. An recovered the bullet from directly behind the skin and turned it over to detectives. Id. at 285. An

located several tiny abrasions on Herron's left fingers and one small abrasion on his right wrist. Id. at 287. An found no evidence of serious injury inside the body, nor did he find any bruises. Id. at 289. An opined that the cause of death was a gun shot wound of the shoulder, which resulted in the laceration of multiple internal organs. Id. at 295. On cross-examination, An testified that it would be possible to die from a single kick or punch, but that he would usually be able to find signs of trauma on the body. Id. at 296.

{¶12} Daniel Ice, a patrolman with the Marion City Police Department, testified that he was driving westbound on West Center Street when he observed a black male run at an angle from Garden Street toward the Sundance bar and enter a parked purple car. Id. at 304. Ice stated that he had no visibility problems and that the person ran around the front of the car and entered the car on the passenger side; however, he was unable to determine if the person entered the front seat or the back seat. Id. at 307.

{¶13} Ice approached the passenger side of the car and observed Horace Hall in the front passenger seat, Jessica Mahley in the driver's seat, and Eric Creagh in the back seat behind Jessica. Id. at 309. All three initially denied running and getting into the car. Id. Ice observed a knife lying on the floor near Creagh's feet, so he began removing the occupants of the car and conducting pat-down searches. Id. Mahley consented to a search of her vehicle, and Ice found

several rounds of live ammunition under the driver's seat. Id. at 316. One of the rounds matched the description of the casings found at the scene of the shooting, so the vehicle was towed to the sally port at the police station where the search was completed. Id. at 316. On cross-examination, Ice stated that he had been unable to see the position of the seats in the car when he pulled up.[1] Id. at 325.

{¶14} James Fitsko, a detective with the Marion City Police Department, went to the hospital and took photographs of Herron's body. He indicated that there had been no noticeable wounds on the body except the bullet wound. Id. at 330. Fitsko had also helped with the search of Mahley's vehicle at the police department. Fitsko found a semi-automatic handgun in the trunk on the passenger side with its barrel facing the vehicle's wheel well. Id. at 338. Fitsko testified that the back of the rear seat could be folded down to allow access into the trunk. Id. at 359. On cross-examination, he stated that a rear-seat passenger could lean forward and move the seat, but he would not agree with defense counsel that a rear-seat passenger could have placed the gun in the trunk in the location where it was found. Id. at 360.

{¶15} Todd Wharton, a forensic scientist in the firearms and tool mark section of the Ohio Bureau of Criminal Identification and Investigation, testified

---

[1] This line of questioning was pursued as part of the defense's argument that Eric Creagh had murdered Herron and had been able to toss the gun into the trunk by pulling open the back of the rear seat, which allowed access to the trunk.

that he had tested the recovered firearm, which was marked as Exhibit 1. Wharton examined the bullets, which Shade had identified as "bullet fragments," and could not state conclusively whether they had been fired from Exhibit 1. Id. at 390-391. However, he also examined the shell casings found at the scene of the shooting and was able to conclusively state that the casings had been ejected from Exhibit 1. Id at 391. On cross-examination, Wharton testified that he could not conclusively state that the bullet, which had been removed from Herron's body, had been shot from Exhibit 1. Id. at 396.

{¶16} The state introduced evidence that the Sundance had been equipped with six cameras on the night of the shooting. The cameras were each connected to a single recording system that operated on a cycle. When the video from March 6 was recovered, it revealed one clip per camera on a rotating basis due to the set up of the equipment at the Sundance. The film was later separated so that the video taken from each camera was consolidated onto individual videotapes. For example, all of the clips taken from Camera 1 were separated and placed on a videotape, and then all of the clips taken on Camera 2 were separated and placed on a videotape. From the individual videotapes, frames were frozen into still images, which were then enhanced.

{¶17} Detective Andy Isom of the Marion City Police Department assisted with the collection of video and photographic evidence. Of particular importance,

at 1:14:30 a.m., a group of people, including Shaw, Robert Baker, Lottie Flournoy, Eric Creagh, and Jessica Mahley exited the bar through the front door. Id. at 453-454. At 1:15:13, Shaw, Baker, Creagh, and Lottie entered the bar. Id. at 455. At 1:16:11, Shaw and Baker exited the bar through the front door. Id. at 456. Approximately ten seconds later, Creagh left the bar through the front door. Id. At 1:18:52, Horace Hall was pictured carrying a coat. Id. at 461. Jessica Mahley left the bar carrying a handful of coats at 1:19:08, and Hall exited through the front door at 1:20:46. Id. at 462-463.

{¶18} At 1:21:36, Shaw entered the bar through the front door. Id. at 464. Isom testified that between 1:16:11 and 1:21:36, Shaw was not in the Sundance. Id. at 465. He also stated that after 1:16, neither Baker nor Creagh re-entered the bar. Id. After he returned to the Sundance, Shaw was seen with Diamond Jones. Id. at 465-468. At 1:23:20, Shaw was seen walking toward the rear exit at the Sundance. Id. at 479. Isom stated that 1:23:20 was the last time Shaw was observed in the Sundance on the morning of March 6, 2008. Id. at 481.

{¶19} Sheila Blair was at the Sundance on March 5-6, 2008. She testified that while a group of people were outside the bar, Lottie pointed at Herron and said, "that's the dude that raped my sister." Id. at 510. Blair stated that everybody went back in the bar and shortly thereafter, Shaw, Baker, and Creagh left. Id. at 512. After the shooting, she got in Lottie's vehicle, and as Lottie drove, they

encountered Creagh. Id. at 514. They asked Creagh if he wanted a ride, but he declined. Id. at 515. On cross-examination, Blair testified that she had told a detective, "Percy's innocent, you got the wrong guy." Id. at 528. However, no explanation was offered for her statement.

{¶20} Jessica Mahley testified that Horace Hall had control of her car while she was at work. He picked her up from work at midnight and took her to the Sundance on March 6, 2008. At some point, she went outside with Blair, Creagh, Lottie, Shaw, and "some other guys." Id. at 539. While they were outside, Lottie pointed out Herron and said, "that's the guy that tried to shoot – or tried to rape my sister." Id. at 541. Mahley stated that the men reacted by getting loud and yelling. Mahley later noticed that the men were missing, and she began gathering coats so she and Hall could go home.

{¶21} Mahley's car had been parked westbound on Center Street just to the west of the Sundance. Mahley threw several coats into the trunk of her vehicle, left the trunk open, got in the car, and started the engine. Id. at 550. Mahley observed Hall standing by the trunk. Id. at 552. She also saw a man in dark jeans walk up to the car, stand near the trunk, and then walk toward the bar. Id. at 552. Hall closed the trunk and got in the passenger side of the car. Id. at 553. Before she could pull out of the parking spot, she and Hall noticed Creagh standing by her car door, so she opened the door, got out, let Creagh into the backseat, and got

back in the car. Id. Patrolman Ice effectuated the stop of her vehicle before she could leave the parking space. Id.

{¶22} Mahley testified that the rear seat did fold down to allow access into the trunk; however, she stated that it made a loud clunking noise when it was both latched and unlatched. Id. at 556. Mahley did not hear the loud clunking noise at any time in the vehicle. Id. She testified that she did not own a gun or ammunition, nor did she know that the gun was in the trunk or that the bullets were under her seat. Id. On cross-examination, Mahley stated that she could not positively exclude Creagh as the person who put the gun in the trunk as he could have crawled into the backseat, opened the backseat, thrown the gun through to the trunk, and closed the backseat all in one move. Id. at 572.

{¶23} Diamond Jones was the cousin of Lottie, Tiffany, and Tara Flournoy. She knew that Shaw had dated Tara at one time. Id. at 578. Jones testified that Shaw exited the bar, entered the bar, and left the bar again. Id. at 580-582. Shortly thereafter, people began reporting that gunshots had been fired. Id. at 583. When she saw Shaw again inside the Sundance, he told her, "I got him." Id.

{¶24} After the shooting, Shaw called his friend, Sean Banks, for a ride. Banks picked up Shaw and Tiffany Flournoy. Id. at 607. Banks testified that Shaw seemed "shook up," and in the car, Shaw said, "I plugged a dude" because

he had tried to rape Tara Flournoy. Id. at 611. On cross-examination, Banks stated that he had had the opportunity to see Shaw with a gun, but never had, and that he was unsure if Shaw had said, "*I* plugged a dude" or "*they* plugged a dude." (Emphasis added). Id. at 621-622.

{¶25} Ted Manasian, a forensic scientist in the trace evidence unit of the Ohio Bureau of Criminal Identification and Investigation, testified that he conducted gunshot residue tests on the samples provided to him by the Marion City Police Department. Manasian testified that both Baker and Creagh tested positive for gunshot residue. Id. at 649. However, Manasian went on to explain that the gunshot residue test "absolutely does not" indicate who shot a firearm. Id. at 641. The test does not answer how gunshot reside came to be on a person and merely indicates whether residue particles were present on a person. Id. Manasian also stated that gunshot residue particles are easily transferred, so the test is only of value in the first few hours after a shooting.[2] Id. at 645. He also testified that somebody who was in the vicinity of a shooting could test positive for gunshot residue particles.

{¶26} Gabriel Feltner, a forensic scientist in the DNA and forensic biology section of the Ohio Bureau of Criminal Identification and Investigation, testified that he tested the firearm, Exhibit 1, found in Mahley's trunk to determine if DNA

---

[2] Shaw was not apprehended until several weeks after the shooting, and the police did not take a sample from him to test for gunshot residue.

samples on the gun would match known DNA samples taken from Mahley, Creagh, Hall, Baker, and Shaw. Id. at 658; 660. The gun revealed a complex mixture of DNA, which had been left by more than one person and which made it impossible to link any of the known samples to the sample taken from the gun. Id. at 663.

{¶27} Tara Flournoy testified that she and Shaw dated before he was sent to prison. While he was in prison, Tara broke up with Shaw and began dating the father of her children again. After his release in January 2008, Shaw continued to call Tara and essentially stalked her. Id. at 684. At the time of the shooting, Shaw as dating Tara's twin sister, Tiffany Flournoy. Id. at 685. Tara told the jury that Herron had tried to "get with" her when she was either 16 or 17 years old. Id. at 687. She had felt uncomfortable about the situation and had called Lottie to come help her. Id. at 687-688. When Tara talked to Shaw on the morning of March 6, he told her he had killed "O-boy" because Herron had "disrespected" her. Id. at 694. Tara testified that Shaw was clear he had killed Herron, and that she had previously seen Shaw with a gun. Id. at 696. Tara stated that Herron had not raped her or tried to rape her but instead had made sexual advances, which she had rejected. Tara also testified that she had discussed the situation with Shaw, and he had accepted her story.

{¶28} Lottie Flournoy testified that she had been intoxicated on the morning of March 6, 2008, and that she may have said that Herron had raped Tara. Id. at 718. Lottie told the jury that she had married Creagh since the time of the shooting, and that her memory of the sequence of events was not the best. At some point after the shooting, Lottie testified that she drove to her mother's house on Wallace Street, which was where Shaw had been living. Id. at 724. Lottie located Shaw in a bedroom, and he was hysterical and crying. Id. Shaw told Lottie that this was his "third one" and repeated, "I got him" several times. Id. at 725. On cross-examination, Lottie discussed how she had driven to the police department after the shooting and after the police had taken Creagh into custody. Although she made contact with somebody at the police department, she forgot to mention that she had Shaw with her in the vehicle. Id. at 741.

{¶29} Robert Baker testified that Shaw asked him at the Sundance to "have his back" because he had been having problems with somebody who had other guys with him. Id. at 772-773. When they left the bar, Baker saw a police car stop by Herron, and he waited for the police to leave. Id. at 776. Baker believed that only he, Creagh, and Shaw went after Herron, and he ran ahead. Id. at 776-777. Baker stated that his intent was to provide protection from others and to let Shaw and Herron fight. Id. at 778. When Baker caught up to Herron, Herron was alone. Baker told him, "shit, my job here is done. I'm gonna go ahead and fall

back. That's your all business." Id. at 780. Herron swung at Baker and grazed his head. Id. Baker hit back with an overhand right fist and punched Herron in the chin. Id. at 782. Herron fell on his back, and Baker hit him several more times. Id. Suddenly, Baker heard somebody say, "Rah,[3] watch out" and shots "rang out." Id. at 782-783. Baker described for the jury how people were situated at the time of the shooting. He stated that he had been near Herron, Shaw as "like here," and Creagh had been behind Baker. Id. at 784. Baker heard about seven shots and saw sparks from Shaw's area. Id. at 785. He specifically stated that Creagh had not fired any shots. Id. at 785; 792.

{¶30} Baker observed Floran Clark's vehicle approaching the intersection and when he turned back, Shaw was gone, and Creagh was standing there with a confused look on his face. Id. at 786. Baker ran back toward the Sundance, removing his outer clothing as he went so he could not be identified by his clothing. Id. at 786. When he got there, he saw the police at Mahley's car and stayed on the southern side of the street. Id. at 787. Baker testified that he had seen a gun earlier in the evening, but he could not state if it was Shaw's gun or if had been the gun used to shoot Herron. Id. at 792-793.

{¶31} On cross-examination, Baker told the jury that Creagh had "told on him" in a prior case, which caused him to serve time in prison. Id. at 795. Baker

---

[3] Baker's nickname was "Rah-Rah."

testified that the shots came from Shaw's direction, but he was unable to say that Shaw had pulled the trigger, as he did not know if other people had joined the group or not. Id. at 804.

{¶32} Eric Creagh testified that outside of the Sundance, Tiffany and Lottie had talked about Herron trying to rape Tara. Id. at 828. Shaw was present during the conversation and got upset. Id. Creagh saw Shaw walk around inside the bar and then leave with Baker in tow. Id. at 829. Creagh stated that one of Shaw's friends asked him to go get Shaw, so he tracked Shaw and Baker. Id. at 830. When he saw Shaw and Baker catch up to Herron, Creagh began to walk toward them. Id. at 831. Creagh watched Baker punch Herron and then watched as Baker and Shaw punched and kicked the victim. Id. at 832. Creagh heard gun shots and saw Shaw shooting at Herron who was lying on the ground in the fetal position. Id. at 833. Shaw ran away with the gun in his possession. Id. at 833-834. Before he got to Mahley's vehicle, Creagh saw Shaw at the Sundance. He then ran across the street and got in Mahley's car. Id. at 834-836.

{¶33} Finally, Detective Rob Musser testified about the audio-taped interview he had conducted with Shaw when he was apprehended in Detroit, Michigan. During the interview, Shaw stated that Creagh and Baker had run off after Herron, and he had followed them. As he was running, his right shoe came off, so he stopped and put it back on. By the time he caught up with Creagh and

Baker, Herron was already on the ground. When Shaw was five or six feet away, he heard gun shots so he turned around and ran away. Shaw told the detectives he was the only one who went back into the Sundance that morning. When he got to the Sundance, he saw Mahley and Hall exiting the bar. He later looked out the front door and saw Creagh across the street. A few minutes later, he looked again and saw that the police had detained Mahley's vehicle and its occupants. Shaw left the bar through the back door.

{¶34} In his appellate brief, Shaw raises several arguments as to why the convictions were against the manifest weight of the evidence. First, Shaw argues that Creagh was not a credible witness because "undisputed forensic evidence implicated Creagh as the shooter and contradicted the story he told at trial." Shaw claims that the six pit marks found in the asphalt were inconsistent with Creagh's story that Shaw had stood directly over Herron and shot.[4] Shaw contends that the pit marks in the asphalt were more consistent with somebody who had been standing several feet away, such as Creagh, and that the gun and bullets were found near Creagh in Mahley's car. Shaw also claims Creagh was not credible because he was serving a seven-year prison term for assault with a deadly weapon

---

[4] No expert evidence was produced concerning bullet trajectory.

at the time of trial, and he had initially tried to blame that crime on somebody named "P.C."[5]

**{¶35}** Second, Shaw claims that Lottie could not be believed based on her relationship to Creagh. Shaw argues that Lottie was significantly impaired and could not adequately recall the events of March 6, 2008, as evidenced by her inability to remember saying anything about Herron or the name of the alcoholic drinks she had consumed. Shaw also contends that Lottie failed to mention anything about him to the police when Creagh was in their custody.

**{¶36}** Third, Shaw contends that Tara Flournoy's testimony was inconsistent because she stated that she was unaware of a problem between Herron and Shaw, plus she exhibited a bias based on her sister's relationship with Creagh. Fourth, Shaw argues that Banks' testimony was equivocal based on his inability to remember whether Shaw stated that "*I* plugged a dude" or "*they* plugged a dude."

**{¶37}** Finally, Shaw attacks Baker's credibility. Shaw asserts that Baker had some doubt as to whether he had been the shooter based on his statement that another person may have been in the vicinity. Shaw claims that Baker was also biased because he had been a close friend of the Flournoys, even though he was not friends with Creagh.

---

[5] "P.C." was Shaw's nickname. Creagh apparently knew Shaw at the time he committed his crime, but he claimed that he was not referring to Shaw when he spoke with police about the shooting he had committed.

{¶38} We recognize that many of the state's witnesses had the potential to be motivated by prejudice or bias. That information was presented to the jury during cross-examination, if not by the state on direct examination. Apparently, the jury opted to believe the state's witnesses that Percy Shaw shot and killed Trevor Herron. As in any case, the "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212.

{¶39} The direct evidence identified Shaw as the shooter. One eye-witness testified that he saw Shaw shooting the gun and leaving the scene with the gun in his possession. The other eye-witness stated that the shots were fired from Shaw's direction, and although other people *could* have been there, he was unable to state that other people *were* there.

{¶40} The circumstantial evidence also pointed to Shaw as the offender. See *State v. Lindsay*, 3d Dist. No. 8-06-24, 2007-Ohio-4490, at ¶ 18, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus ("[c]ircumstantial evidence is good evidence and has the same probative value as direct evidence."). Mahley testified that she observed a person approach Hall near the open trunk of her car outside of the Sundance. Shaw, admittedly, was the only person to return to the Sundance and had the opportunity to put the gun in the trunk or to hand it to Hall who put it in the trunk. Baker never returned to the

Sundance, and Creagh arrived after the trunk was closed and Hall was in the car. Apparently, the jury did not believe the defense's theory that Creagh had opened the back of the rear seat and thrown the gun into the trunk in the few seconds it took for him to enter the car and for Patrolman Ice to detain the vehicle and its occupants. There were various accounts of Shaw admitting the shooting to other people, and again, their believability was an issue for the jury. Finally, we note that the state also presented evidence of Shaw's prior conviction for possession of cocaine in Marion County Common Pleas Court case number 07-CR-33. For all of the above reasons, we cannot hold that the jury clearly lost its way, and the assignments of error are overruled.

{¶41} The judgment of the Marion County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., and SHAW, J., concur.**

**/jlr**