[Cite as *State v. Hicks*, 2014-Ohio-704.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99974**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TIMOTHY A. HICKS

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-568992

**BEFORE:**   Jones, J., Boyle, A.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:**   February 27, 2014

**ATTORNEY FOR APPELLANT**

Patricia J. Smith
4403 St. Clair Avenue
The Brownhoist Building
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Edward D. Brydle
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Timothy Hicks appeals his convictions for felonious assault and having weapons while under a disability. We affirm.

I. Procedural History

{¶2} In December 2012, Hicks was charged with two counts of felonious assault and one count of having weapons while under a disability. All three counts contained one- and three-year firearm specifications. The felonious assault counts additionally contained notice of prior conviction and repeat violent offender specifications.

{¶3} The matter proceeded to a jury trial, except for the having weapons while under a disability count and the notice of prior conviction and repeat violent offender specifications, that were tried to the bench. The jury found Hicks not guilty of the felonious assault as charged in Count 1, but guilty of the felonious assault and firearm specifications as charged in Count 2. The court found Hicks guilty of the notice of prior conviction and repeat violent offender specifications attendant to Count 2. The court also found Hicks guilty of having weapons while under a disability. The trial court sentenced Hicks to an eight-year prison term.

II. Facts

{¶4} The victim in this case was Keith Marable. In the early morning hours of August 18, 2012, Marable was shot while he was walking through the parking lot of the Garden Valley Apartments in Cleveland.

{¶5} Marable testified that he dropped off his girlfriend, Ashate Sullivan, to the

apartment complex. At the same time he was dropping Sullivan off, Sullivan's cousin was arriving at the complex. Sullivan and her cousin met up, and Marable remained in his car, waiting to make sure the two women safely entered the apartment complex.

{¶6} According to Marable, there were three males in the parking lot; two of them were sitting on a car, and the other was standing up next to the car. Marable later identified the man standing next to the car as Hicks.

{¶7} Marable had his car window rolled down, and as Sullivan and her cousin were walking to the apartment complex, he heard the males trying to get the females' attention by talking crudely to them, which bothered Marable. The females talked to the group and the cousin gave Hicks her telephone number.

{¶8} Sullivan and her cousin went into the complex, and Marable approached the males. He told them that Sullivan was his girlfriend and he did not appreciate the way they were talking to her. Marable testified that he was not aggressive in the way he approached the group.

{¶9} However, according to Marable, Hicks took an aggressive stance toward him, so he backed off, told Hicks "no disrespect," and turned to walk away. Marable testified that he heard someone say something to the effect that he was going to get "messed up for a girl."

{¶10} When Marable was about 15 to 20 feet away from the group, he heard gunshots. He turned around and saw appellant aiming a gun directly at him. Marable ran into the apartment complex and saw that he had been shot in the foot.

{¶11} Meanwhile, Sullivan had come back outside and again encountered the males, of which she testified there were four — then and when she initially had encountered them. One of the males told her that Marable had run away and left his car running. According to Sullivan, everyone in the group appeared calm. She called Marable on his cell phone, and he told her that he had been shot; she took his car, picked him up, and drove him to the hospital. Sullivan testified that she did not see the shooting or hear shots being fired.

{¶12} Cleveland Police officer John Douglas responded to the hospital and spoke with Marable, Sullivan, and her cousin. Marable told Douglas the same version of events that Marable testified to, including that the cousin had given her phone number to Hicks.

{¶13} Sullivan and her cousin were hostile to the officer. The cousin did, however, give the officer the telephone number she had gotten, which the lead detective on the case confirmed was for a cell phone belonging to Hicks. The detective compiled a photo array; Marable "immediately" identified Hicks as the shooter and indicated that he was "100 percent" sure.

{¶14} Hicks testified at trial. He admitted that he had three 2009 convictions for robbery with a firearm specification, drug trafficking, and having weapons while under disability, and that he served a three-year prison term for the offenses.

{¶15} Hicks admitted to being at Garden Valley at the time in question, but denied having or firing a gun. According to Hicks, he was in parking lot hanging out with his

brother, Titus, and Titus's friends Joseph Hart and Zavious Hawthorne; another male that Hicks did not know was also with the group.

{¶16} Hicks admitted that he made a crude remark to one of the young women the group saw and exchanged phone numbers with the other one. Hicks also testified that after Marable had approached the group and told them that Sullivan was his girlfriend and he did not want Hicks and his friends talking to her, everyone in the group said "all right" and "just go on, get up out of here."

{¶17} According to Hicks, as Marable was walking away, he saw a gun "coming across [his] face," and a male started shooting from the right side of him near where Joseph and Zavious were standing. After shooting, the male ran off. Hicks and his friends decided to leave before the police arrived.

{¶18} Hicks testified that the shooter must have been the male who was unknown to him. He admitted that his brother, Titus, probably knew who the male was, but never asked his brother about the believed-shooter's identity, even after being charged in this case. Hicks admitted that it was strange that he never inquired.

{¶19} Joseph Hart testified on Hicks's behalf, and corroborated Hicks's testimony that a "random" male was hanging out with the group. Hart testified that he knows a lot of people in the Garden Valley neighborhood, but he had never before seen the random male, who he guessed was about his age, and had not seen him again since the incident.

{¶20} According to Hart, Marable was acting aggressively when he approached

the group, and Hicks was the only one who spoke to him. Hart initially testified that he did not know who fired the shots, but he was sure that the shooter was not anyone in the group, including the random male. Hart believed that the shots came from behind a nearby building. However, Hart changed his testimony, and stated that the random male could have been the shooter after all.

{¶21} Hawthorne also testified on Hicks's behalf. Hawthorne corroborated Hart's testimony that Hicks was the one who addressed Marable when he approached the group about talking to his girlfriend. Hawthorne described Hicks as "getting angry" because Marable was "antagonizing" him. Hawthorne testified that he did not know where the shots came from, but he knew Hicks did not fire them, because he was standing right next to Hicks and Hicks would have shot him. Hawthorne also testified that there was a random male who joined the group that evening; no one knew who he was, but he left prior to the confrontation between Hicks and Marable. Hawthorne did not know where the shots came from.

### III. Law and Analysis

{¶22} Hicks's sole assignment of error reads:

> The jury lost its way and rendered a verdict of guilt which was against the manifest weight of the evidence when several witnesses were able to state that the appellant did not shoot the victim and where there was no scientific or physical evidence to support their verdict.

{¶23} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

*Wilson* at ¶ 25.

{¶24} An appellate court may not merely substitute its view for that of the factfinder, but must find that "in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at *id.*

{¶25} Hicks contends that his conviction was against the manifest weight of the evidence because the "only evidence at trial which pointed to the appellant as the perpetrator * * * came from the testimony of Keith Marable." According to Hicks, Marable's testimony was not reliable because it was not corroborated by any other witness, it was the middle of the night, and Marable was only able to identify Hicks

because he had had words with him. We disagree.

{¶26} Although appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *Thompkins* at 386.

{¶27} This is not an extraordinary case where the evidence weighed heavily in favor of acquittal. The jury did not believe Hicks's theory that the shooter was a random male who was with his brother and his brother's friends. Given that Hicks testified that, although his brother probably knew the random male, he never inquired about him, even after being charged with the shooting, there was nothing extraordinary about the jury discrediting Hicks's theory.

{¶28} Likewise, it was not extraordinary that the jury discredited Hart and Hawthorne's testimony. Hart was initially insistent that no one from the group, including the random male, was the shooter. But Hart changed his testimony, and stated that the shooter could have been the random male. Hawthorne testified that he did not know where the shots were fired from, but he was sure Hicks did not fire them because they were standing right next to each other and he would have been hit if Hicks were the

shooter.

**{¶29}** It was not extraordinary that the jury believed Marable's testimony that while walking away from Hicks after having a confrontation with him, he heard gunshots, turned around, and saw Hicks aiming a gun at him.

**{¶30}** On this record, the weight of the evidence supports the convictions for felonious assault and having weapons while under a disability. Hicks's sole assignment of error is, therefore, overruled.

**{¶31}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

MARY J. BOYLE, A.J., and
MARY EILEEN KILBANE, J., CONCUR