[Cite as *S. Euclid v. Farley*, 2014-Ohio-4374.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 100271

## CITY OF SOUTH EUCLID

PLAINTIFF-APPELLEE

vs.

## NATOSHA S. FARLEY

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
South Euclid Municipal Court
Case No. CRB 1200368

**BEFORE:** Blackmon, J., Rocco, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** October 2, 2014

**ATTORNEYS FOR APPELLANT**

Robert L. Tobik
Cuyahoga County Public Defender

BY: Erika B. Cunliffe
Assistant Public Defender
310 Lakeside Avenue
Suite 200
Cleveland, Ohio 44113


**ATTORNEY FOR APPELLEE**

Brian M. Fallon
P.O. Box 26267
Fairview Park, Ohio 44126

PATRICIA ANN BLACKMON, J.:

**{¶1}** Appellant Natosha S. Farley ("Farley") appeals her conviction for criminal damaging and assigns the following error for our review:

> Natosha Farley was deprived of her liberty without due process of law, where her conviction for causing criminal damage to property is contrary to the weight of the evidence presented.

**{¶2}** Having reviewed the record and pertinent law, we affirm Farley's conviction. The apposite facts follow.

**{¶3}** James Hochevar rented a house located on Villa Drive in South Euclid, Ohio to Farley. Farley lived in the home for five years with her husband and two daughters. Because Farley was expecting a third child, she and her husband decided to move to a larger home. According to Hochevar, during the time the family lived there, he got along fine with them. He even converted his home to Section 8 housing when Farley lost her job so that they could continue to live there.

**{¶4}** Prior to the family moving out of the home, Hochevar surveyed the premises with the Farleys. According to Farley's husband, Eugene Lee Farley, III ("Ernest"), Hochevar told him he would not be refunding the security deposit until he determined how much it would cost to recarpet and repaint the home. Hochevar claims he was withholding the security deposit until the Farleys paid the quarterly water bill. Either way, Hochevar's refusal to refund the security deposit angered Farley to the extent she threatened Hochevar over the telephone that she still had access to the house, in spite

of returning her keys and the garage door openers, and was going to tear out the copper piping and destroy the house.

{¶5} In response to the threat, Hochevar changed the locks on the door the next day. A neighbor, who lived across the street from the rental property, testified that he was home during the afternoon of August 10, 2012. He had his front door open because it was a nice day. He observed an SUV, which he knew was the former tenant's vehicle, pull into the driveway. When he heard breaking glass, he looked out his door and observed Farley in the garage with a broom breaking out the glass windows on the garage door that led to the interior of the house. He claimed the shattering lasted for about 10 to 15 seconds. As he called 911, Farley's car pulled out of the driveway. He estimated this was about 3:15 p.m. The police arrived about five minutes later, but because the garage door was closed, they could not see the damage. Upon determining that Hochevar was the owner of the home, they contacted him and left a message. When Hochevar arrived, he opened the garage door, and the police observed five of the six windows on the interior door were broken. He stated that it cost him $250 to repair the windows.

{¶6} According to Officer Adam Singerman, the neighbor told them the vandal was a black female, who he recognized as the former tenant. The police called Farley to tell her about the allegations, and she denied being the perpetrator. She refused to give the police her new address for them to send the citation for criminal damaging.

However, when she was told a warrant would be issued, she came to the station to pick up the citation.

{¶7} Farley's husband, Ernest, testified on Farley's behalf. He stated that at the time they moved from the rental home, Farley was 34 weeks pregnant, and it was a high-risk pregnancy. He stated she was supposed to be on bed rest, but when she went out, she would use a wheelchair or powered scooter. He stated the afternoon of the break in, he, his wife, and daughter were at Sam's Club. A receipt from Sam's Club on the date in question was presented showing that they checked out of Sam's Club at approximately 2:41 p.m.

{¶8} Ernest claimed that while they were shopping, his wife began experiencing contractions, so they stopped shopping so that she could go to her doctor's office located at Hillcrest Hospital. However, they first checked out the groceries and then stopped to get some food at the concession stand at Sam's Club. After waiting approximately 20 minutes, his wife decided she did not want to wait for the doctor, and they left to go home.

{¶9} The state presented evidence that Google Map estimated the time from Sam's club to the Villa Drive house would take 21 minutes, which would allow time for Farley to have damaged the home at 3:15, if the family had gone directly to the house from the store.

{¶10} The trial court found Farley's alibi was not credible and found her guilty as charged. The trial court sentenced Farley to 30 days of house arrest, 100 hours of

community service, one year of probation, fined $650, ordered to pay $200 in restitution to Hochevar, and was ordered to attend anger management classes.

## Manifest Weight of the Evidence

{¶11} In her sole assigned error, Farley contends her conviction was against the manifest weight of the evidence.

{¶12} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id*. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id*. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id*. at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id*. at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

*Id*. at ¶ 25.

{¶13} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a

new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case that the evidence weighs heavily against the conviction." *Id*.

{¶14} Farley contends the trial court erred by concluding the neighbor was more credible than her husband because (1) at the time Farley suffered from a high-risk pregnancy that basically left her bedridden; therefore, she would not have been able to lunge with a broom or ride in an SUV, (2) when describing the perpetrator to the police, the neighbor failed to tell the police Farley was pregnant, (3) she had no access to the garage because she returned the garage door openers, and (4) she had a shopping receipt showing she was at Sam's Club prior to the incident and would not have been able to travel to Hochevar's house to commit the crime at the time alleged by the neighbor.

{¶15} We conclude the trial court did not err by concluding Farley's explanation was not credible. Although Farley contends she suffered from a high-risk pregnancy, no medical evidence was presented regarding her physical limitations during the pregnancy beyond Farley's husband's claims that she would not have been able to get into a SUV or lunge with a broom. However, the trial court had to weigh this against Hochevar's testimony that Farley was upset that her security deposit was not returned and threatened to destroy the house. Also, the court had to consider the fact that the neighbor, who had nothing to gain from the case, testified that he was positive that Farley was the perpetrator. The neighbor had lived across the street from Farley the entire time Farley lived there and, although, he never socialized with her, he was familiar enough with her to

be able to recognize her. He did not describe her as pregnant, but he did state that she was a "heavy-set" black woman. He claimed to have a clear view of the part of the garage in question, which was to the right.

{¶16} The neighbor had also described Farley's SUV, albeit not perfectly, as the one he saw in the driveway. As the court stated, the neighbor's description of the vehicle, "closely match[ed] that which was at the scene of the incident, which turned out to be a Lincoln Aviator as opposed to a Lincoln Navigator, not very distinct from that which you drove on that day, and not very different from the actual vehicle that you did, in fact, drive." Tr. 10. The neighbor described the SUV as being silver instead of gold; however, given the neighbor described the car's model and size, this inconsistency was inconsequential.

{¶17} The receipt from Sam's Club in and of itself also does not conflict with the neighbor's identification of Farley. The receipt shows that the check-out occurred at 2:41 p.m. According to the neighbor, he saw Farley in the garage and called the police at around 3:15 p.m. He stated the shattering lasted about 10 to 15 seconds, and that while he was on the phone with police, the Lincoln pulled out of the driveway. The state presented evidence that Google Maps estimated that it took approximately 21 minutes to travel from Sam's Club to the house. This would allow Farley sufficient time to commit the act, which was committed in a matter of seconds.

{¶18} Farley's husband did testify that they also stopped at the concession stand at Sam's Club after checking out and went to his wife's doctor thereafter because she started

experiencing contractions while they were shopping. However, the trial court disbelieved this part of the alibi because in spite of Farley's contractions, the family checked the groceries out, stopped to eat, and Farley, after waiting 20 minutes at the doctor's office, decided to go home instead of waiting for the doctor to see her. The doctor had no records that Farley had been at the office. The court concluded these actions, continuing to check out, stopping to eat, and leaving the doctor's office without being seen, were not reasonable for a person experiencing an alleged "high-risk" pregnancy, who was experiencing contractions. Thus, if the Farleys did not stop to eat or go to the doctor's office, there was sufficient time for Farley to damage the property.

{¶19} Finally, the perpetrator would have had to have access to the garage door opener. There was no evidence of a break-in through the other doors and the neighbor testified the garage door was open. Farley contends that she returned the keys and garage door openers to Hochevar. However, Hochevar testified that when Farley moved in, he gave her one key and one garage door opener. When she moved out, she returned two or three keys and three garage door openers. Therefore, since Farley was able to program additional garage door openers, it is not beyond belief that she possessed a fourth one.

{¶20} After weighing the evidence, all inferences, and any discrepancies, we cannot find that a manifest miscarriage of justice occurred in this case. Accordingly, Farley's conviction for criminal damaging is not against the manifest weight of the evidence. Farley's sole assigned error is overruled.

**{¶21}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the South Euclid Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON,   JUDGE

KENNETH A. ROCCO, P.J., and
MARY EILEEN KILBANE, J., CONCUR