[Cite as *State v. Torres*, 2016-Ohio-3061.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 103402**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ANTONIO E. TORRES

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-593549-A

**BEFORE:** Kilbane, P.J., Boyle, J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** May 19, 2016

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue - Suite 800
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Marcus A. Henry
Timothy Troup
Assistant County Prosecutors
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

{¶1} Defendant-appellant, Antonio Torres ("Torres"), appeals from his sexual battery conviction. For the reasons set forth below, we affirm.

{¶2} On March 12, 2015, Torres and his brother, Dontez Torres ("Dontez"), were indicted for alleged sexual assaults upon two women, T.B. and B.G. With regard to Torres, the indictment charged him with two counts of rape, in violation of R.C. 2907.02(A)(2) (Counts 1 and 4); two counts of rape, in violation of R.C. 2907.02(A)(1)(c) (Counts 2 and 5); and two counts of kidnapping with a sexual motivation specification, in violation of R.C. 2905.01(A)(4) and 2941.l47(A) (Counts 3 and 6). Counts 1-3 list T.B. as the victim, and Counts 4-6 list B.G. as the victim.

{¶3} The trial court granted Torres's motion for a separate trial. The matter against Torres proceeded to a jury trial on June 10, 2015. The following evidence was adduced at trial.

{¶4} B.G. testified that T.B. came to her Medina apartment for a visit on June 15, 2014. At around 9:00 p.m., T.B. invited B.G. to go out with Torres and Dontez. B.G.'s father arrived to watch her children, and the men picked the women up around 11:00 p.m. Someone in the group decided to go to a strip club called "Secrets" in Cleveland. B.G. testified that she did not feel comfortable there so she went outside and called a friend to pick her up. B.G. was not able to get a ride. She went back inside and had two drinks but was not intoxicated.

{¶5} B.G. further testified that when Secrets closed, Torres and Dontez did not want to drive the women back to Medina. Instead, they drove to an after-hours location and purchased a bottle of liquor. B.G. had two more drinks but did not feel drunk. She denied smoking marijuana and taking drugs. The group drove back to Dontez's apartment in North Olmsted. B.G. testified that there were no sexual overtones during the evening, and she did not consent to have sex with anyone. She eventually fell asleep on the floor in the living room and Dontez fell asleep nearby.

{¶6} B.G. next testified that when she awoke, Dontez was on top of her, and his penis was inside her vagina. She seemed to be blacking out, and she was unable to move or to speak. She quickly fell back to sleep. When she awoke a second time, Torres was on top of her, and all of her clothes were off. Torres was also naked, and his penis was inside her vagina. B.G. told Torres to stop, but he did not immediately do so. She started to cry and had a panic attack. She went to the bedroom and saw T.B. face down on the bed. T.B. was not moving, and all of her clothes were also off. B.G. testified that Torres told her to calm down and told her that they had all agreed to have sex. B.G. could not calm down. She tried unsuccessfully to wake T.B., then sat down on the floor.

{¶7} B.G. stated that she fell asleep for a third time, and awoke for the third time with Dontez again on top of her and engaging in sexual intercourse with her. B.G. had a second panic attack. She was confused and felt like she could not breathe. When T.B. woke up, B.G. informed her of what had happened to her during the night. The women

gathered their clothes and began to argue. As they collected their things to leave the apartment, B.G. grabbed a piece of mail containing Dontez's name and address.

{¶8} B.G. called several friends to pick her up, but she could not reach anyone. She and T.B. began to walk towards their home, then Torres and Dontez pulled over and offered them a ride home. B.G. testified that she felt disgusted and was still crying, but accepted the ride. After she arrived home, she contacted a friend to drive her and T.B. to the hospital.

{¶9} B.G. spoke with a police officer at the hospital following her examination. Several days later, she met with a detective from the North Olmsted Police Department. She identified Torres and Dontez from photo arrays and also identified Torres in the courtroom.

{¶10} B.G. denied that she had consensual sex with Torres. She did acknowledged that her clothes were under the bed in his bedroom. She also denied smoking marijuana, but toxicology tests showed that this drug was found in her system.

{¶11} Sarah Tokodi ("Tokodi"), a sexual assault nurse examiner ("S.A.N.E. nurse") at Summa Lake Medina Hospital, testified that she examined B.G. on June 16, 2014. B.G. reported that she and T.B. went out with two male acquaintances. They had a few drinks, then went back to the home of one of the men. B.G. was going to go to sleep in the living room, with Dontez nearby, and T.B. was going to sleep with defendant in the bedroom. B.G. stated that after she fell asleep, she woke up to find herself naked with Dontez on top of her and having sex with her. She fell back to sleep,

and when she woke up again, Torres was on top of her, and his penis was in her vagina. When she woke up for the third time, Dontez was on top of her. She then began screaming and "freaking out" that she did not consent to sex. She got her friend and they left the apartment.

{¶12} Tokodi collected evidence for a rape kit, including B.G.'s clothes, nail scrapings, hair samples, cavity swabs, and a urine specimen. Tokodi observed new bruising to her thigh, shin, and ankle. B.G. complained of neck pain but no neck injuries were noted.

{¶13} T.B. failed to cooperate with the state and did not appear for trial.

{¶14} Deborah Hafliger ("Hafliger"), a S.A.N.E. nurse at Summa Lake Medina Hospital, testified that she examined T.B. on June 16, 2014, after T.B. complained of having been sexually assaulted. According to Hafliger, T.B. informed her that she and her friend went to a "gentlemen's club" with two men, then went back to an apartment belonging to one of the men. T.B. reported that she "came to," and found Torres on top of her. She then "blacked out," and when she "came to" a second time, Dontez was on top of her. She "came to" a third time, and Torres was again on top of her. T.B. reported that Torres had penetrated her with his penis and with his fingers. Hafliger noted some bruising and a small abrasion. Hafliger collected evidence for the rape kit and gave the kit to the North Olmsted Police.

{¶15} North Olmsted Police Officer Gordon Goodman ("Officer Goodman") testified that he responded to the Summa Lake Medina Hospital to speak with T.B. and

B.G. He obtained statements from them, collected the rape kits, and learned the names of two suspects, "Tony" and "Donny."

{¶16} William Hampton ("Hampton"), father of B.G., testified that he agreed to watch B.G.'s children on the night of June 15, 2014, after B.G. and T.B. made plans to go out. The women returned the next day and appeared distraught and angry. The women eventually indicated that they had been raped, so Hampton called B.G.'s mother for assistance.

{¶17} Terry Pugh ("Pugh"), testified that he considers himself to be B.G.'s stepfather. He testified that B.G. called him on June 16, 2014, asking for a ride to the hospital. She was upset, crying, and frantic. He and B.G.'s mother drove her and T.B. to the hospital.

{¶18} Stacy Violi ("Violi"), a forensic scientist in the DNA section of the Ohio Bureau of Criminal Investigation ("BCI"), testified that she analyzed the rape kits collected for both B.G. and T.B. With regard to B.G., semen was identified in both the vaginal and perianal samples, and B.G.'s underwear tested presumptively positive for the presence of semen. The initial test results revealed that B.G. and two unknown males were contributors to the semen in the vaginal sample. B.G. and one of the same unknown males were the contributors to the semen in the perianal sample. B.G. and two unknown males were also contributors to the sample from the underwear, but there was insufficient material for DNA analysis.

**{¶19}** Violi prepared a second report on November 8, 2014, after obtaining known standards from Torres and Dontez. Violi identified Torres and Dontez as contributors to the vaginal sample, with a frequency of the presence of that DNA as 1 in 1,246,000 individuals. Dontez was a contributor to the perianal sample, and Torres was excluded as a contributor. On one of the samples from B.G.'s underwear, Dontez was a major contributor and Torres was a minor contributor, with a frequency of the presence of that DNA as 1 in 4,946,000 individuals.

**{¶20}** Violi testified with regard to T.B., that semen was initially identified in the vaginal and perianal samples from her rape kit. Further testing conducted on November 8, 2014, indicated that Torres was the major contributor to the vaginal and perianal samples, with an expected frequency of 1 in 196 quintillion individuals.

**{¶21}** Harold Schueler ("Schueler"), the chief toxicologist for the Cuyahoga County Medical Examiner, testified that at the request of the North Olmsted Police Department, he analyzed B.G.'s urine sample collected at approximately 7:00 p.m. on June 16, 2014. No alcohol was detected. According to Schueler, however, this does not conclusively demonstrate that B.G. did not consume alcohol because alcohol is absorbed, broken down, and eliminated over time. The urinalysis was positive for cannabinoids, but negative for various classes of drugs, including sedatives, opiates, and other drugs. It was also negative for any known date rape drug or a drug that would render someone unconscious, but these drugs are generally very fast acting and clear out of the body very quickly.

**{¶22}** North Olmsted Police Detective Kenneth Vagase ("Detective Vagase"), testified that he began to investigate the matter on June 17, 2014. He compiled photo arrays that included both Torres and Dontez. Both B.G. and T.B. identified Torres and Dontez as the men they were with on the night of the incident. Detective Vagase interviewed both women and obtained DNA samples from Torres and Dontez. Detective Vagase forwarded the DNA samples to BCI. Torres and his counsel arrived for a videotaped interview on January 19, 2015. Torres stated that the women wanted to go to the strip club, and then wanted to go to Dontez's apartment. When they arrived at the apartment, Torres had consensual sex with T.B. in his bedroom, and Dontez had consensual sex with B.G. in the living room. Torres denied engaging in sexual relations with B.G. and also denied that Dontez had sex with T.B. Later during the interview, after being confronted with the DNA results, Torres stated that he had briefly touched B.G. and had extremely brief vaginal intercourse with her.

**{¶23}** Torres moved for acquittal of all charges. The trial court denied Torres's motion, and the defense elected not to present evidence. The trial court also agreed to instruct the jury on the offense of sexual battery under R.C. 2907.03(A)(3) as a lesser included offense of rape as charged in Counts 2 and 5.

**{¶24}** On June 16, 2015, the jury acquitted Torres of the charges contained in the indictment, but found him guilty of sexual battery, in violation of R.C. 2907.03(A)(2), as a lesser included offense of rape as alleged in Count 5, pertaining to B.G. The trial court obtained a presentence investigation report and the matter proceeded to sentencing on

August 3, 2015. The court sentenced Torres to 24 months in prison and 5 years mandatory postrelease control. The court determined that Torres is a Tier 3 offender who must register every 90 days for life.

{¶25} Torres now appeals, assigning two errors for our review.

Assignment of Error One

The trial court erred in denying Torres's motion for acquittal as to the charge when the State failed to present sufficient evidence to sustain a conviction.

Assignment of Error Two

Torres's conviction is against the manifest weight of the evidence.

Sufficiency of the Evidence

{¶26} In the first assignment of error, Torres argues that the trial court erred in denying his motion for acquittal because there is insufficient evidence to support the conviction.

{¶27} Crim.R. 29(A) governs motions for acquittal and provides for a judgment of acquittal if the evidence is insufficient to sustain a conviction. Pursuant to Crim.R. 29(A), a defendant is entitled to acquittal on a charge against him "if the evidence is insufficient to sustain a conviction[.]" *See also State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus: "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different

conclusions as to whether each material element of a crime has been proven by a reasonable doubt."

**{¶28}** An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541.

**{¶29}** Torres was convicted of sexual battery, in violation of R.C. 2907.03(A)(2), which provides that "[n]o person shall engage in sexual conduct with another * * * when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired."

**{¶30}** In *State v. Noernberg*, 8th Dist. Cuyahoga No. 97126, 2012-Ohio-2062, ¶ 10, this court noted:

> In *State v. Zeh*, 31 Ohio St.3d 99, 103, 509 N.E.2d 414 (1987), the Ohio Supreme Court held that because the phrase "substantially impaired" is not defined in the Ohio Criminal Code, it "must be given the meaning generally understood in common usage." The *Zeh* court also held that it is sufficient for the state to establish substantial impairment by offering evidence at trial establishing a reduction or decrease in the victim's ability to act or think. *Id.* at 103-104. "Substantial impairment does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim." *State v. Brady*, 8th Dist. No. 87854, 2007-Ohio-1453, ¶ 78.

{¶31} This court has also held that "sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct." *State v. Jones*, 8th Dist. Cuyahoga No. 98151, 2012-Ohio-5737, ¶ 30, citing *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 21. *Accord State v. Felton*, 8th Dist. Cuyahoga No. 92295, 2010-Ohio-4105, ¶ 26 ("a sleeping person also cannot appraise the nature of or control his or her conduct."); *State v. Grant*, 8th Dist. Cuyahoga No. 86220, 2006-Ohio-177, ¶ 33 ("sleeping qualifies as substantial impairment").

{¶32} In this matter, the evidence presented by the state demonstrates that B.G. consumed two drinks at the strip club and two more after the group bought liquor at the after-hours location. B.G. and T.B. were then driven to Dontez's apartment in North Olmsted, and the men promised to drive them home in the morning. There were no sexual overtones, and B.G. fell asleep in the living room of Dontez's apartment, while Torres and T.B. were in the bedroom. When B.G. woke up, Dontez was on top of her, and his penis was inside her vagina. The state's evidence demonstrated that B.G. "seemed to be blacking out" and was unable to move or speak. When she woke up the second time, she was naked and Torres, who was also naked, was on top of her. His penis was inside her vagina. She told Torres to stop, but he did not immediately do so. She started to cry and had a panic attack. When she fell asleep for the third time, she again woke up with Dontez on top of her and having sex with her. B.G. consistently described the attack to both the S.A.N.E. nurse and the police. DNA analysis of her

vaginal swabs, perianal swabs, and underwear indicated a mixture of DNA from both Torres and Dontez. The state's evidence also indicated that Torres first denied having sex with B.G., then admitted that he had briefly done so after he was presented with the DNA analysis.

{¶33} Viewing this evidence in a light most favorable to the state, we find that the record demonstrates, and a rational trier of fact could conclude beyond a reasonable doubt, that Torres committed the offense of sexual battery. Specifically, given the extensive testimony regarding her blacking out, and repeatedly falling asleep and her inability to move or speak despite repeated attacks, we conclude that the record contains sufficient evidence to show that B.G. was "substantially impaired" at the time of the sexual conduct and that Torres was aware of her condition. The conviction is supported by sufficient evidence.

{¶34} Therefore, the first assignment of error is overruled.

<u>Manifest Weight of the Evidence</u>

{¶35} In the second assignment of error, Torres argues that his conviction is against the manifest weight of the evidence. Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *Thompkins* at 387. The *Thompkins* court stated:

Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather

than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find *the greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) *Black's* [*Law Dictionary*] 1594 [6 Ed.1990].

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. [Quoting *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652 (1982)]. *See also State v. Martin* (1983), 20 Ohio App.3d 172, 175, * * *, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*

**{¶36}** In this matter, the state's evidence demonstrated that B.G. consumed two drinks at the bar and also drank alcohol purchased at the after-hours location before being driven back to Dontez's apartment. She testified that there were no sexual overtones to the evening. She did not consent to sexual intercourse with anyone, and she fell asleep in the living room. She was later awakened by Dontez being on top of her and engaging in sexual intercourse. She "seemed to be blacking out" and was unable to move or speak. She awoke for a second time, and at that point, she was naked and Torres, who was also naked, was on top of her. His penis was inside her vagina. B.G. told Torres to stop, but he did not immediately do so. After she fell asleep for the third time, she was again awakened by Dontez being on top of her and having sex with her. B.G. consistently described the attack to both the S.A.N.E. nurse and the police, and DNA analysis of vaginal swabs, perianal swabs, and underwear indicated a mixture of DNA from both Torres and Dontez. The state's evidence also indicated that during his interview with Detective Vagase, Torres denied having sex with B.G., then, after being informed of the DNA results, admitted that he had briefly done so. Viewing the record as a whole, we cannot say that the jury lost its way in convicting Torres of sexual battery, in violation of R.C. 2907.03(A)(2), and that he engaged in sexual conduct with B.G. while knowing that her ability to appraise the nature of or control her conduct was substantially impaired. The conviction is not against the manifest weight of the evidence.

**{¶37}** Thus, the second assignment of error is overruled.

**{¶38}** Judgment is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR